**IN THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| QUECTEL WIRELESS SOLUTIONS CO., LTD., | |
|     No. 8 Waipojing Road, Sijing Town, Songjiang District, Shanghai 201601, China | Civil Action No. 1:26-cv-_____  <br><br>**COMPLAINT** |
|         *Plaintiff*, | |
|         v. | |
| UNITED STATES DEPARTMENT OF DEFENSE, | |
|     1400 Defense Pentagon <br>    Washington, D.C. 20301 | |
| PETER HEGSETH, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF DEFENSE, | |
|     1000 Defense Pentagon <br>    Washington, D.C. 20301 | |
| MICHAEL CADENAZZI, in his official capacity as ASSISTANT SECRETARY OF DEFENSE FOR INDUSTRIAL BASE POLICY, | |
|     3050 Defense Pentagon <br>    Washington, D.C. 20301 | |
|         *Defendants*. | |

Plaintiff Quectel Wireless Solutions Co., Ltd. ("Quectel") brings this action against Defendants U.S. Department of Defense ("the Department"), Peter Hegseth, in his official capacity as Secretary of Defense, and Michael Cadenazzi, in his official capacity as Assistant Secretary of Defense for Industrial Base Policy, and alleges as follows:

## INTRODUCTION

1.      Founded in 2010, Quectel is a global provider of Internet of Things ("IoT") solutions and wireless technology. The company specializes in the design, development, and manufacture of cellular modules and antennas used in IoT devices like car infotainment systems and other "smart" connected electronics devices. Quectel is a global company with operations in the United States and around the world. It works closely with industry-leading Original Equipment Manufacturers ("OEM") and ecosystem partners. Quectel has not—and does not—support the Chinese military or the Chinese defense industrial base in any way. It designs and manufactures purely civilian technology that is used by people and enterprises around the world.

2.      This action challenges the unlawful designation of Quectel as a "Chinese military company" ("CMC") pursuant to Section 1260H(a) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("Section 1260H" and "FY2021 NDAA").[1] The January 7, 2025, designation of Quectel as a CMC (the "Designation") has caused and will continue to cause the company serious, irreparable, and unwarranted economic, reputational, and other harm. The Designation was made without any legitimate justification, without factual support for its allegations, and without any forewarning and opportunity to be heard. Moreover,

---

[1] Pub. L. No. 116-283, § 1260H(d)(1), 134 Stat. 3965 (2021) (as amended by National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118–159, §1346, 138 Stat. 2123 (2024)).

the Department has maintained the Designation despite being in possession of incontrovertible evidence contradicting the purported basis for its determination for over a year.

3.      As soon as Quectel was designated, it acted to correct the Department's clear mistake. It availed itself of the Department's "reconsideration process"—which allows designated companies to provide the Department evidence supporting removal from the Section 1260H List[2]—that was announced at the same time as the Designation. Counsel for Quectel emailed the Department's newly established Section 1260H electronic mailbox and asked for the administrative record supporting the Designation. On February 4, 2025, Quectel received a summary report setting forth the basis for the Designation (the "Report"). The Department did not provide Quectel the full administrative record.

4.      The Report—which is 13 pages in length but confines the purported basis for the Designation to only a few bulleted paragraphs—is replete with a wide-range of factual and legal errors. For instance, the Report misstates basic facts, such as the location of Quectel's headquarters and the identities of Quectel's business partners. It also relies on stale, unreliable, second- and third-hand sources, including a years-old *Newsweek* article, which relied, in turn, on even older, even more unreliable sources. One *Newsweek* source, in particular, was a consultant who Quectel has learned is affiliated with two think tanks that are financially supported ***by a Quectel competitor***.

5.      As another example, the Report recites that Quectel received three "awards" as proof of an "affiliation" with the Chinese Ministry of Information and Industry Technology ("MIIT")—without any explanation for how or why these widely and commonly-received industry recognitions show any degree of "affiliation" with MIIT. These awards were given to Quectel as

---

[2] The Section 1260H List is sometimes referred to as the Chinese Military Companies List ("CMC List" or "the List"). Those terms will be used interchangeably herein.

long as *eight years* before the Designation and recognized the company's development of technology that could, for example, livestream sports and entertainment in high definition. The Report conspicuously does not (because it cannot) explain how those awards create any meaningful connection to MIIT or military-civil fusion.

6. Most of the errors could have (and should have) been caught by a cursory internet search.

7. A formal reconsideration request, submitted by Quectel to the Department on March 24, 2025, pointed out these clear and incontrovertible errors and was supported by a declaration from the company's founder and CEO. But, upon receiving this information, the Department did not correct its Report. Rather, it used the reconsideration request as an opportunity to conduct a wide-ranging and largely irrelevant investigation of Quectel—sending Quectel's counsel a series of follow-up questions, which, for the most part, had no connection to the basis set forth in the Report or the reconsideration request. Nevertheless, Quectel carefully investigated each of the questions and provided full, transparent answers.

8. In January 2026—almost ten months after Quectel's reconsideration petition was submitted—Quectel secured a meeting with the Department where it reiterated these points and demonstrated to the Department that its nearly year-long mistake was gravely harming Quectel and its business partners. The presentation was met with little more than silence. The Department provided Quectel with a pro forma assurance that its request was under review. The Department declined to engage with Quectel on the irrefutable facts that Quectel provided, which undermine the Designation, and declined to provide Quectel any timeline regarding when the Department expected to act on the reconsideration request.

9.      On February 13, 2026, a pre-publication version of the Federal Register notice containing the Section 1260H List was posted online for approximately an hour before it was withdrawn (the "February 2026 Notice"). This pre-publication version of the List appeared to maintain Quectel on the Section 1260H List but appeared to alter the statutory justification for the listing.

10.     On February 17, 2026, counsel for Quectel reached out to the Department to ascertain whether this publication meant that the reconsideration process was finally completed. On February 20, 2026, the Department again provided a pro forma statement that it was "still processing" the reconsideration request.

11.     Recognizing that all pre-suit attempts to engage with the Department to date were met with inaction, on March 11, 2026, counsel for Quectel transmitted a letter, along with a proposed complaint, advising the Department of its intent to initiate litigation if Quectel was not removed from the Section 1260H List within 30 days. Counsel emphasized that the harm to Quectel and its business partners caused by the erroneous Designation—which Quectel predicted to the Department a year earlier—was growing, and urgent action by the Department was required.

12.     On March 24, 2026, counsel for Quectel sent the Department an additional letter detailing one specific imminent harm affecting Quectel, its business partners, and a major U.S. industry, automobile manufacturing, as a direct consequence of the Designation. The letter explained that one of Quectel's key U.S.-based suppliers had expressed concerns regarding the Department's continued inaction with respect to the Designation and made the decision to terminate its relationship with Quectel. The letter further explained that this disruption would not only lead to significant lost revenue for Quectel, but that the impact would be felt by many downstream suppliers and manufacturers in the American automobile industry.

13.    On April 15, 2026, counsel for Quectel contacted the Department to inquire whether the Department intended to respond to either letter. But, the Department, once again, met Quectel's requests for the most basic information about the Department's reconsideration process with little more than silence. The Department stated only that it could not determine when its review of Quectel's reconsideration request would be complete, or when the updated 1260H List would be published.

14.    Quectel made its final, good faith attempt to engage with the Department in an April 22, 2026, letter. Quectel reiterated, again, that the basis for the listing is clearly insufficient, and that further delays would continue to harm the company—especially in view of the substantial damage the Designation was already causing. Quectel indicated that it intended to seek judicial relief but was also mindful that in virtually all prior litigation challenges to a Section 1260H listing, the Department changed the basis for the listing in the middle of the litigation—leading to months of additional delays, including the need to amend pleadings and refile briefs. Quectel stated that it wanted to avoid such an outcome and requested that the Department provide, at minimum, any new facts or bases that the Department was considering or a date certain by which it will finalize its determination. That request seemed particularly relevant, and reasonable, in conjunction with the apparently new listing basis set forth in the February 2026 Notice. Providing such information would allow Quectel to make an informed decision regarding if and when to seek judicial intervention. Nevertheless, the Department failed to respond to the letter beyond acknowledging its receipt.

15.    Quectel gave the Department every opportunity to resolve its reconsideration request and remove the company from the 1260H List without resorting to litigation. Quectel has acknowledged—in multiple different communications—that it would be an unnecessary and

wasteful use of resources, for all parties, if Quectel were to initiate litigation only for the Department to later change the asserted basis for the Designation, as the February 2026 Notice (and the Department's conduct in other court challenges to CMC designations) suggests it may do.

16.    Over a *year* has now passed since the reconsideration request was submitted. The Department has not given Quectel any sign that it will correct its clear errors and reverse the baseless Designation. Nor has it issued an updated version of the 1260H List in 2026 despite its statutory obligation to do so at least annually. These failures reveal that the Department's new "reconsideration process" is no process at all.  Rather, it appears to be nothing more than an electronic mailbox from which the Department can send follow-up questions aimed at stalling and searching for alternative bases to support erroneous and harmful designations rather than meaningfully engaging with pending urgent removal requests. Quectel, thus, must turn to the Court to reverse the Department's baseless and costly Designation.

17.    As discussed below, the Defendants' conduct was unlawful, and the Court should grant relief for four reasons. *First*, the Defendants' facially unreasonable designation of Quectel and its failure to remove the Designation violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in numerous ways. *Second*, Defendants acted *ultra vires* and in excess of their statutory authority by designating Quectel as a CMC despite the total inapplicability to Quectel of the criteria for such designation under Section 1260H and the federal government's own pronouncements defining CMCs. *Third*, by failing to provide Quectel with notice of, or an opportunity to meaningfully challenge the basis for the Designation and by unfairly singling out Quectel from similarly situated companies, Defendants have deprived Quectel of their property and liberty rights without due process of law, in violation of the Fifth Amendment of the U.S. Constitution. *Fourth*, Section 1260H is unconstitutionally vague as applied to Quectel because it

fails to provide fair notice of what conduct may result in designation and permits arbitrary and inconsistent enforcement, in violation of the Fifth Amendment.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution and the laws of the United States, including the APA, 5 U.S.C. § 551 *et seq.*

19.     The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers or employees acting in their official capacities, and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

21.     Quectel is an independent company that is traded on the Shanghai stock exchange. Quectel has operations all over the globe. It is currently headquartered in Shanghai, China.

22.     Defendant U.S. Department of Defense is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1). On January 7, 2025, the Department of Defense published a list designating Quectel as a CMC under Section 1260H.

23.     Defendant Peter Hegseth is the Secretary of Defense and is sued in his official capacity.

24.    Defendant Michael Cadenazzi is the Assistant Secretary of Defense for Industrial Base Policy. In this role, he manages the process for the Department's placement of entities on the Section 1260H List and the process for the Department's removal of entities from the Section 1260H List. He is sued in his official capacity.

## LEGAL FRAMEWORK AND BACKGROUND

A.    **Section 1260H Requires the Secretary of Defense to Identify and Publish a List of CMCs**

25.    Section 1260H of the National Defense Authorization Act for Fiscal Year 2021, which is operative here, directs the Secretary of Defense to identify Chinese military companies that operate directly or indirectly in the United States or any of its territories and possessions. *See* FY2021 NDAA § 1260H(a).

26.    Section 1260H defines "Chinese military company" as any entity that is "(i)(I) directly or indirectly owned, controlled, or beneficially owned by, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party" or "(i)(II) identified as a military-civil fusion contributor to the Chinese defense industrial base;" and "(ii) engaged in providing commercial services, manufacturing, producing, or exporting." *See* FY2021 NDAA § 1260H(d)(1).

27.    The term "military-civil fusion contributor" is defined to include (i) "entities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus;" (ii) "*entities affiliated with the Chinese Ministry of Industry and Information Technology, including research partnerships and projects*;" (iii) "entities receiving assistance, operational direction or policy guidance from the State Administration for Science, Technology

9

and Industry for National Defense;" (iv) "any entities or subsidiaries defined as a 'defense enterprise' by the State Council of the People's Republic of China;" (v) "entities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone;" (vi) entities awarded with receipt of military production licenses by the Government of China, such as a Weapons and Equipment Research and Production Unit Classified Qualification Permit, Weapons and Equipment Research and Production Certificate, Weapons and Equipment Quality Management System Certificate, or Equipment Manufacturing Unit Qualification;" (vii) "entities that advertise on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China;" and (viii) "any other entities the Secretary of Defense determines is appropriate." *Id.* § 1260H(d)(2) (citation modified).[3]

28.    Section 1260H provides no further criteria indicating how the "military-civil fusion contributor" must "contribute to the Chinese defense industrial base" for purposes of the statute.

29.    The term "People's Liberation Army" is further defined as "the land, naval, and air military services, the People's Armed Police, the Strategic Support Force, the Rocket Force, and any other related security element within the Government of China or the Chinese Communist Party that the Secretary determines is appropriate." *Id.* § 1260H(d)(3).

30.    The Secretary of Defense is required to identify Chinese Military Companies "based on the most recent information available." *Id.* § 1260H(a).

---

[3] Section 1260H was amended most recently in 2025. These amendments, among other things, defined the term "affiliated with" and changed the definition of a "Chinese military company." However, the Designation was made before these amendments became effective, and so Quectel focuses on the language of Section 1260H that applied when the Department acted. But, as alleged herein, whether the Court considers the language of Section 1260H either pre- or post-amendment, the Department's designation of Quectel as a CMC was improper and unlawful.

31.     The Secretary is required to provide a report to Congress, concurrently published in the Federal Register, of all entities he has identified as Chinese Military Companies on an annual basis. *Id.* § 1260H(b)(1)-(2). The Secretary is further required to make additions or deletions to the "most recent list submitted [to Congress]…[not less frequently than annually] based on the most recent information available."

32.     Once this designation is made, the Secretary of Defense may reverse his determination that an entity is a CMC only after providing fifteen days written notice to the Congressional defense committees. Moreover, none of the funds appropriated under the Further Consolidated Appropriations Act 2024 (Pub. L. No. 118-47, 138 Stat. 460 (2024)) can be used by the Department of Defense to facilitate removing a company from the Section 1260H List.

**B.      The Department's Reconsideration Process**

33.     Consistent with its obligations to implement "reasonable procedures" that are "necessary to implement the provisions of [Section 1260]" (Section 1260H(e)) and contemporaneous with the Designation on January 7, 2025, the Department announced a reconsideration process in which entities included in the Section 1260H List can email the Department to seek reconsideration.

34.     Requests for reconsideration must include: "(1) The listed entity's name and mailing address (including email address) and an authorized representative's name and mailing address (including email address) and (2) A statement indicating the entity's intent to request reconsideration of the Department's determination, including a detailed description with supporting evidence of why the listed entity should be removed from the 1260H List." Notice of Availability of Designation of Chinese Military Companies, 90 Fed. Reg. 1105-02 (Jan. 7, 2025).

35.     The reconsideration process also allows entities to include "additional information such as arguments and evidence that establishes that an insufficient basis exists for the listing or

that the circumstances resulting in the listing no longer apply." *Id.* While the announcement does not provide a timeline for reconsideration, Section 1260H(e) requires the Department's reconsideration procedures to be "reasonable," which would include acting on requests in a reasonable time and manner.

36.     In addition to this requirement, subsection (b)(3) of Section 1260H separately requires the Department to revise the List of entities that it provides to Congress based on the most recent information available—irrespective of whether a reconsideration request has been made— no less than annually.

## C.     Purpose of the Section 1260H List

37.     Various legislators have stated that the Section 1260H List furthers the twin aims of: (1) monitoring companies allegedly working with China's military, and (2) preventing U.S. industry and supply-chains from both funding those companies and relying on those companies.[4]

38.     Senator Kevin Cramer, who sits on the Senate Armed Services Committee, stated publicly that the intent is to make American and international companies aware of which companies are CMCs so they will "strategically decouple"—*i.e.*, stop doing business with them.[5]

39.     Representative Andy Barr, member of the Subcommittee on National Security, Illicit Finance, and International Financial Institutions, stated during a hearing with the House Foreign Affairs Committee that the purpose of the Section 1260H List (alongside the Non-SDN

---

[4] *Combatting the Generational Challenge of CCP Aggression: Hearing Before the H. Comm. on Foreign Affs.*, 118th Cong. 2 (2023) (statement of Michael McCaul, Chairman, H. Comm. Foreign Affairs) ("[T]hese companies are military companies for the CCP, [a]nd both are listed on the entities list. If BIS continues to mindlessly greenlight sensitive technology sales, the CCP has proven they will use our own inventions against us.").

[5] Kevin Cramer, *Senator Cramer Discusses Border Security, Threat of TikTok, Inflation on Fox Business*, KEVIN CRAMER U.S. SENATOR FOR NORTH DAKOTA (Mar. 12, 2024), https://www.cramer.senate.gov/news/press-releases/senator-cramer-discusses-border-security-threat-of-tiktok-inflation-on-fox-business.

Chinese Military-Industrial Complex Companies List) is "to prevent American investors from financing entities tied to the CCP[,] or these Chinese military industrial complex firms that are still included in emerging growth Index funds either on U.S. exchanges or foreign stock exchanges, or even through private equity or credit investments."[6]

40.    On September 30, 2020 (three months before the enactment of the FY2021 NDAA), House Republicans published the "China Task Force Report."[7] The report called for "[c]utting off material support of CCP military industrial base companies, including divestment from companies with ties to the CCP military."[8]

41.    On December 18, 2025, several members of Congress sent a letter to Secretary Hegseth seeking the inclusion of additional companies on the Section 1260H List. The letter explained that listing entities on the Section 1260H List would "directly support Congress' intent that U.S. taxpayer funds not underwrite PRC military-industrial and internal-security or intelligence capabilities."[9]

D.    **Ramifications of the Designation**

42.    Section 1260H imposes serious consequences for entities included on the CMC List.

---

[6] *Combatting the Generational Challenge of CCP Aggression: Hearing Before the H. Comm. on Foreign Affs.*, 118th Cong. 57-58 (2023) (statement of Rep. Andy Barr).

[7] Michael McCaul, Chairman, U.S. House of Representatives, 116th Cong., *China Task Force Rep.* (2020).

[8] *Id.*

[9] *See* Letter from Members of Congress to Pete Hegseth, Secretary of Defense 1 (Dec. 18, 2025), https://chinaselectcommittee.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/12.18.25-letter-to-dow-1260h-additions.pdf

13

43.     As described above, the 1260H List is intended, at least in part, to "nam[e] and sham[e]"[10] the listed entities to put public pressure on these entities and all those who do business with them.

44.     Moreover, Section 805 of the FY2024 NDAA contains two punitive prohibitions targeting entities included on the Section 1260H List, which will soon go into effect.[11] First, under Section 805(a)(1)(A), the Secretary of Defense may not "enter into, renew, or extend a contract for the procurement of goods, services, or technology" with an entity identified on the Section 1260H List, or an entity subject to the control of an entity identified on the Section 1260H List. *See* FY2024 NDAA § 805(a)(1)(A). This prohibition takes effect on June 30, 2026. *Id*. § 805(b). Second, under Section 805(a)(1)(B), the Secretary of Defense may not "enter into, renew, or extend a contract for the procurement of goods or services *that include goods or services produced or developed*" by an entity identified on the Section 1260H List, or an entity subject to the control of an entity identified on the Section 1260H List. *Id*. § 805(a)(1)(B) (emphasis added). This prohibition takes effect on June 30, 2027, *id*. § 805(b) and would not only apply to Quectel but would also apply to any entity that relies on Quectel's products and/or services.

45.     Further, Section 536 of the Further Consolidated Appropriations Act of 2024 states that "[n]o Federal funds made available to the Department of Homeland Security may be used to

---

[10] Jordan Brunner & Emily Weinstein, *Chinese Military-Civil Fusion and Section 1260H: Congress Incorporates Defense Contributors*, LAWFARE (May 4, 2021) ("Section 1260H focuses on strengthening the 'naming and shaming' foundation laid by Section 1237."), https://www.lawfaremedia.org/article/chinese-military-civil-fusion-and-section-1260h-congressincorporates- defense-contributors.

[11] To implement these prohibitions, Section 805 directs the Department of Defense to amend the Defense Federal Acquisition Regulation Supplement ("DFARS") no later than one year after the enactment of FY2024 NDAA (*i.e.*, by Dec. 23, 2024) to implement prohibition (1)(A), and to amend the DFARS no later than 545 days after the enactment of FY2024 NDAA (*i.e.*, by June 19, 2025) to implement prohibition (1)(B). *See* National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, § 805(a)(4), 137 Stat. 136 (2023) ("FY2024 NDAA").

enter into a procurement contract, memorandum of understanding, or cooperative agreement with, or make a grant to, or provide a loan or guarantee to, any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ([Pub. L. No.] 116–283) or any subsidiary of such entity."

46.     On March 21, 2024, during a hearing of the House Foreign Affairs Committee, then-Under Secretary of Commerce for Industry and Security Alan Estevez noted that the Bureau of Industry and Security ("BIS") generally has no interest in issuing licenses to export items to entities on the Section 1260H List, agreeing with the sentiments raised by a member of Congress during questioning.[12]

47.     On February 26, 2026, certain members of Congress transmitted a letter to the Secretary of the U.S. Department of the Treasury encouraging the restriction of U.S. private investment in Quectel and numerous other Chinese companies by adding them to the Office of Foreign Assets Control ("OFAC") Non-SDN Chinese Military-Industrial Complex Companies List ("NS-CMIC List"). The letter's sole basis for such a restriction on Quectel was its designation as a CMC on the 1260H List.[13]

48.     States have used and likely will continue to use the Section 1260H List in their own statutes to place onerous restrictions on companies like Quectel. For example, Utah Code 63L-13-

---

[12] *Countering China on the World Stage: Empowering American Businesses and Denying Chinese Military Our Technology: Hearing Before the H. Comm. on Foreign Affs.*, 118th Cong. (2024) (statement of Alan Estevez, Sec'y Com. for Indus. and Sec.) (confirming he was "really [not] interested in issuing licenses to do business with [CMC]s."), https://foreignaffairs.house.gov/committee-activity/hearings/countering-china-the-world-stage-empowering-american-businesses-and-denying-chinese-military-our-technology.

[13] *See* Letter from Members of Congress to Scott Bessent, Sec'y of the Treasury (Feb. 26, 2026), https://mcusercontent.com/e585eec970e20145fb02e3825/files/7a6ad5a2-d2cb-db21-59c6-a89fb52f653f/COINS_Implementation_Letter_02.26.2026.pdf.

201(2) states that restricted foreign entities, such as those on the Section 1260H List, are precluded from buying land in the state of Utah.

### E.   Defendants' Earlier CCMC List

49.   The Department of Defense previously administered a "Communist Chinese military companies" list ("CCMC List"), under Section 1237 of the National Defense Authorization Act for Fiscal Year 1999 ("FY1999 NDAA").[14] Under Section 1237, to put a company on the CCMC List, the Department of Defense needed to establish that a person was either "owned or controlled by" or "affiliated with" the People's Liberation Army or a ministry of the government of the People's Republic of China, or was "owned or controlled by" an entity affiliated with the defense industrial base of the People's Republic of China. *See* Pub. L. No. 105-261, § 1237, 112 Stat. 2160.

50.   As with the CMC List, the Department of Defense did not provide any explanation or factual basis for inclusion on the CCMC List, or disclose what administrative process, if any, it followed.

51.   After the Department of Defense issued its fourth version of the CCMC List on January 14, 2021, several designated companies brought legal challenges in the U.S. District Court for the District of Columbia. Those plaintiffs alleged, among other causes of action, that the designations: (1) were arbitrary and capricious under the APA, 5 U.S.C. § 706(2); (2) were *ultra vires* and in excess of the Department's authority; and (3) violated the Due Process Clause of the Fifth Amendment.

---

[14] Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261, 112 Stat. 1920 (1998).

52.     In two of those cases, the U.S. District Court for the District of Columbia granted plaintiffs' motions for a preliminary injunction and motion for a temporary restraining order in early 2021. *See Xiaomi Corp. v. DOD*, Civ. A. No. 21-280 (RC), 2021 WL 950144, at *1 (D.D.C. Mar. 12, 2021); *Luokung Tech. Corp. v. DOD*, 538 F. Supp. 3d 174, 178 (D.D.C. 2021).[15] The court in *Xiaomi* notably concluded that the CCMC designation process "was deeply flawed and failed to adhere to several different [legal] requirements" and that the Department's conclusion was "plainly" not supported by substantial evidence. 2021 WL 950144, at *8.

53.     The Biden administration decided on June 3, 2021, to effectively scrap the CCMC List.[16] To replace the CCMC List, the Biden administration: (1) established the OFAC, Non-SDN Chinese Military-Industrial Complex Companies List, creating a new Chinese military-industrial complex companies sanctions regime and (2) established a new list—the CMC List—pursuant to Section 1260H of the National Defense Authorization Act for Fiscal Year 2021, which suffers from the same (and additional) procedural defects as the CCMC List.

## FACTUAL ALLEGATIONS

### A.     Quectel's Business

54.     Quectel Wireless Solutions, founded in 2010, is a global provider of IoT solutions and wireless technology. Quectel specializes in the design, development, and manufacture of cellular modules and antennas, which serve as critical components in IoT applications.

---

[15] In the third case, *Gowin Semiconductor Corp., v. U.S. Department of Defense,* Gowin moved for voluntary dismissal after the Department delisted it, and all other previously designated entities, pursuant to E.O. 14032. No. 1:21-CV-01396 (RC), ECF No. 12 (D.D.C. June 25, 2021).

[16] Exec. Order No. 14032, 86 Fed. Reg. 30145, *Addressing the Threat from Securities. Investments. that Finance Certain Companies of the People's Republic of China* (June 3, 2021).

55. Quectel's IoT components have applications in many industries, including asset tracking, digital signage, commercial telematics, remote monitoring, telehealth, retail, and automotive.

56. Quectel maintains the highest industry standards of security and data privacy. Quectel's products, which are designed only for personal and commercial uses, exceed industry standards and best practices in security and compliance measures.

57. Quectel does not design, develop, or modify products for military end users or end uses. Quectel enforces a strict policy of always confirming whether a customer intends to use products incorporating its components for a military purpose. If Quectel has knowledge of military use, or if any customer refuses to certify non-military use, the company refuses to sell.

58. Quectel complies with all U.S. and international export control and sanctions laws. Quectel requires its distributors and resellers to abide by the same restrictions.

59. Since its founding, Quectel has been under the control of a private individual, Patrick Qian, who is the CEO and Chairman of Quectel's Board of Directors. Patrick Qian remains the largest shareholder of Quectel. All other shareholders have holdings below 10%.

60. Patrick Qian is a permanent resident of Australia.

61. Quectel is an independent company that is traded on the Shanghai stock exchange.

62. Quectel is not aware of having received any investment funding from any entity of the PRC government since the company's founding.

63. Quectel is not and has never been owned or controlled by the PRC government, by any regional or municipal Chinese government entity, or by any entity that is owned or controlled by any Chinese government entity.

18

64.     Quectel has never been owned or controlled by the People's Liberation Army ("PLA") or by any entity that is owned or controlled by the PLA.

65.     Quectel operates internationally. Quectel is currently headquartered in Shanghai, China, and has offices, regional teams, and technical support centers across the world.

66.     The United States is one of Quectel's primary markets. Quectel works closely with leading OEMs and major U.S. cellular network operators.

**B.      The Select Committee on the Chinese Communist Party Peddles Erroneous and Misleading Information about Quectel**

67.     The United States House of Representatives Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party ("the Select Committee") wrote a letter on January 3, 2024, to then-Defense Secretary Lloyd Austin and then-Treasury Secretary Janet Yellen "outlining new information on Quectel Wireless Solutions' problematic relationships with a civil-military fusion arm of the Chinese government."[17]

68.     The Select Committee letter is filled with errors and is poorly sourced. For example, the letter incorrectly states that Quectel has "multiple affiliations with [MIIT]."[18] This is entirely inaccurate. As stated above, Quectel is an independent company with no ties to the PRC government.

69.     The Select Committee letter further misstates that "Quectel supplies IoT modules for BeiDou, the PRC's GPS alternative."[19] This is incorrect.

---

[17] Press Release, The Select Comm. on the CCP, *Gallagher, Krishnamoorthi Urge Admin. to Blacklist Quectel as a 'Chinese Military Company'* (Jan. 4, 2024), https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese.

[18] *Id.*

[19] *Id.*

70.     The letter also provides false and hyperbolic concerns over security vulnerabilities that have no basis in fact.[20] To the contrary, as Quectel has disclosed publicly, its products were independently validated as substantially exceeding industry standards and best practices across multiple cybersecurity measures.[21]

71.     Quectel's modules meet the stringent standards of regulatory and conformance bodies such as CE, Federal Communications Commission ("FCC"), the Green Climate Fund, the PCS Type Certification Review Board, Bluetooth® SIG, and the Wi-Fi Alliance. Quectel's modules have earned certifications from more than eighty leading operators worldwide. Quectel has achieved more than 200 FCC certifications in the last two years alone.

### C.     Defendants Designate Quectel as a CMC

72.     On January 7, 2025, the Department released a list designating fifty-six companies (not counting subsidiaries) as CMCs, including Quectel.

73.     On January 24, 2025, through counsel, Quectel requested a copy of the full administrative record, so that it could avail itself of the Department's reconsideration process that had also been announced on January 7.

74.     On January 27, 2025, counsel for Quectel received an unsigned e-mail response from the Department's "Section 1260 Mailbox" indicating that the Department would provide a "courtesy copy" of the "rationale for including Quectel on the Section 1260H List." The Department indicated that it would not provide a copy of the full administrative record and directed Quectel to make a Freedom of Information Act ("FOIA") request.

---

[20] *Id.*

[21] Press Release, Quectel, *Quectel IoT modules get high security scores from cybersecurity expert Finite State; pioneering cybersecurity transparency program begins* (Sep. 26, 2023), https://www.quectel.com/news-and-pr/iot-modules-high-security-finite-state/.

75.    On February 4, 2025, counsel for Quectel received a copy of the Department's Report, dated December 6, 2024.

76.    The Report alleged that Quectel was a "military civil fusion contributor" because of its "affiliation with the Chinese Ministry of Industry and Information Technology (MIIT) in research partnerships and projects" and that it "contributes to the Chinese defense industrial base through its development of IoT products with GPS." (Report at 6). These assertions are plainly false and the result of a wholly unreasonable investigation. As discussed further below, the support for these conclusions was an amalgamation of dated, questionable internet sources that provided second and even third-hand accounts of supposed connections to the Chinese government, which even if accepted as true do not support the Report's bottom-line conclusions.

77.    Defendants did not provide any prior notice to Plaintiff indicating that the Department was considering designating Quectel as a CMC prior to issuing the List on January 7, 2025. Quectel first learned of the Designation when the updated 1260H List was made public.

78.    Notwithstanding the Designation, Quectel does not meet the statutory definition of a CMC. Quectel is not "owned, controlled, or beneficially owned by, or in an official or unofficial capacity acting as an agent of or on behalf of the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party" nor is it a "military-civil fusion contributor" that "contributes to the Chinese defense industrial base" under the statute.[22]

**D.    Quectel Attempts to Engage with the Department**

79.    On March 24, 2025, counsel for Quectel submitted a letter to the Department requesting removal from the 1260H List pursuant to the Department's reconsideration process. In

_____

[22] FY2021 NDAA § 1260H(d)(1).

21

the letter, Quectel outlined in detail the many factual errors contained in the Report and explained why the basis for the Designation was without legal or factual basis. Quectel supported each of its assertions with a declaration from its CEO, Patrick Qian. This correspondence provided the Department with the most current information available regarding Quectel's business and demonstrated that the Designation was erroneous and could not be supported.

80.     On April 8, 2025, in response to its request for removal from the 1260H List, counsel for Quectel received follow-up questions from the Department that had virtually no relation to Quectel's reconsideration request or the Department's stated basis for the Designation. The Department's response failed to acknowledge the errors contained in its December 6, 2024, Report. On April 25, 2025, Quectel provided detailed responses to the Department's questions.

81.     On May 16, 2025, Quectel requested a status update from the Department via email. On May 20, 2025, the Department responded that it was continuing to review the information, and that it would "endeavor to process the review of Quectel's reconsideration request expediently."

82.     On June 2, 2025, counsel for Quectel followed up with the Department via phone. Counsel spoke with a Department attorney who could not provide any specific information about Quectel's reconsideration request despite the substantial amount of information provided by Quectel.

83.     On June 4, 2025, counsel for Quectel received additional follow-up questions from the Department via email, which, again, went beyond the scope of the basis set forth in the Report.

84.     On August 6, 2025, after careful investigation and review of voluminous corporate records, counsel for Quectel provided written answers to the Department's additional questions.

85.     On August 11, 2025, the Department indicated that it was reviewing Quectel's responses and posed even more follow-up questions, which, again, required a substantial investigation for Quectel to respond.

86.     On November 19, 2025, after a diligent investigation, counsel for Quectel provided written answers to the Department's questions of August 11, 2025.

87.     Counsel for Quectel followed up with the Department via email on December 12, 2025, to request an opportunity to meet in person to get a status update and provide further information that demonstrated that the year-old Designation was premised on faulty information and was without legal basis.

88.     Counsel met with the Department on January 13, 2026. During the meeting, counsel for Quectel provided further details that Quectel had uncovered that showed the substantial unreliability of the information on which the Department relied for the Designation, including additional information about a consultant affiliated with organizations paid by a Quectel competitor spreading a false narrative about Quectel's purported military ties. Counsel also explained that the Report's conclusions that Quectel is a military-civil fusion contributor and contributes to the Chinese defense industrial base rely on erroneous facts and legal principles. During the meeting, Department representatives declined to provide any additional information about Quectel's status and could only confirm that its nearly year-old reconsideration request was still being reviewed.

89.     On February 13, 2026, a pre-publication version of a Federal Register notice with an updated Section 1260H List was made available for public inspection. That version of the List indicated that Quectel remained designated based on an asserted "indirect affiliation with MIIT."

23

At no point during the reconsideration process had the Department indicated to Quectel or its counsel that it was considering this alternative basis under the amended 2025 version of the statute.

90.    Approximately one hour after the February 2026 Notice was posted, the revised Section 1260H List was withdrawn by the Department.

91.    On February 17, 2026, counsel for Quectel inquired of the Department as to whether this meant that the reconsideration process had been completed. In response, on February 20, 2026, the Department continued to obfuscate. It stated:

> The Department is currently still processing Quectel's reconsideration request. It came to the attention of the Department that the 1260H list posted for public inspection on the Federal Register on February 13 may require updates based on the statutory requirement to review the most recent information available. The Department is consistently reviewing the most recent information available. The Department will publish an updated list in accordance with the statute to make additions or deletions as the Secretary deems appropriate.

92.    On March 11, 2026, Quectel transmitted a letter along with a proposed complaint—advising the Department of its intent to initiate litigation if Quectel was not removed from the Section 1260H List within 30 days. Counsel emphasized that as Quectel waited to hear from the Department, it was suffering cascading damage, including the imminent loss of a major supplier, making the urgency of the request even greater.

93.    On March 24, 2026, counsel for Quectel sent an additional letter detailing the specific and imminent harm affecting Quectel, its business partners, and American automobile manufacturing as a direct consequence of the Designation.

94.    The March 24 letter explained that one of Quectel's U.S.-based suppliers had expressed concerns regarding the Department's continued inaction with respect to the Designation and made the decision to terminate its relationship with Quectel for flash memory products. The letter further explained that this disruption would not only lead to significant lost revenue for

24

Quectel, but that the impact would be felt by many downstream suppliers and manufacturers in the U.S. automobile manufacturing industry.

95.    The Department failed to respond to either letter beyond acknowledging receipt. On April 15, 2026, counsel for Quectel contacted the Department by phone to understand whether the Department had any intention of responding. During that call, counsel reiterated Quectel's concerns regarding the adequacy of the reconsideration process, including the inefficiency and potential prejudice of filing suit before the Department finalized its position.

96.    On April 17, 2026, the Department provided a short email response to the points raised by Quectel's counsel during the April 15 phone conversation. The Department stated only that it could not determine when its review would be complete or when the updated 1260H List would be published in the Federal Register.

97.    In a final effort to avail itself of the Department's reconsideration process and avoid unnecessary litigation, Quectel sent a letter on April 22, 2026, notifying the Department that (1) any attempt to revise the basis for Quectel's listing would be erroneous and in violation of both Section 1260H and the APA, and (2) its failure to reasonably engage with Quectel deprived Quectel of a fair and reasonable process for the adjudication of its reconsideration request. Quectel requested that, no later than April 29, 2026, the Department provide, at a minimum, a date certain by which it will finalize its reconsideration determination, and identification of any current factual bases or statutory grounds on which the Department would rely so that Quectel may be heard before it had to resort to litigation.

98.    The Department acknowledged receipt of Quectel's letter on April 23, 2026. Despite ample notice of Quectel's intention to file suit, the Department failed to respond by the April 29 deadline.

99.    It has been over one year since the Designation and, despite being provided extensive information in response to the Department's multiple rounds of questions, the Department is "still processing" Quectel's request for removal.

100.    These efforts to engage constructively with the Department to administratively resolve this dispute are consistent with Quectel's longstanding history of compliance with U.S. policy and cooperation with the U.S. government.

101.    Quectel engaged with the Department in good faith. It availed itself of the reconsideration process that the Department established at the time of its Designation. Quectel provided detailed responses to request after request from the Department—incurring significant amounts of time and cost—even where most of those requests had no apparent connection to the basis set forth in the Report that was currently being "reconsidered."

102.    The failure to promptly remove Quectel confirms that this process is nothing more than a bureaucratic fig leaf intended to convince this Court that the Department afforded Quectel due process. It most certainly has not.

103.    The Department relied on stale, dubious, and at times facially erroneous sources to manufacture a listing basis that does not meet the legal requirements of the statute. It gave Quectel no opportunity to be heard before inflicting the injurious listing on it.

104.    When Quectel then, in good faith, provided detailed information about how and why the listing was wrong, the Department did not immediately withdraw the erroneous Designation. Rather, the Department used the reconsideration process to further investigate Quectel *for months* in the hope of finding a new basis to maintain the Designation.

105.    By its nature, the reconsideration process is, thus, woefully inadequate.

106.    Quectel has no adequate available administrative remedy, and has exhausted its administrative remedies, informally and formally. Quectel is left with no choice but to file the instant lawsuit.

**E.      The Report's Two Predicate Findings—Concerning MIIT "Affiliation" and GNSS Compatibility—Are Unsupported and Contrary to the Record**

107.    The Report states that Quectel is a CMC based on its finding that Quectel is a military-civil fusion contributor to the Chinese defense industrial base. That conclusion relies, in turn, on two predicate findings, each necessary to the Designation: (1) Quectel is a military-civil fusion contributor "because of its affiliation with MIIT through research partnerships and production projects," and MIIT providing Quectel "recognition and awards," (Report at 7 (citation omitted)); and (2) Quectel "contributes to the Chinese defense industrial base through its development of IoT products" because some of these products are compatible with BeiDou, China's Global Navigation Satellite System ("GNSS"). (Report at 6).

108.    As discussed herein, each of these findings: (1) is plainly erroneous; (2) ignores easily ascertainable facts and information that undermine the accuracy of the finding; (3) is not accompanied by a sufficient explanation; (4) relies on dated, unreliable sources; (5) is not the result of a reasonable investigation; (6) is not supported by substantial evidence; and (7) relies on conduct that pre-dates the passage of Section 1260H. Additionally, when the Department was indisputably in possession of the most current information, which explained why its basis was incorrect, the Department failed to take Quectel off the 1260H List.

*a.      The Single Champion Award and the Silver Award Do Not Create An Affiliation With MIIT*

109.    The Report alleges that Quectel's receipt of two "awards"—the Manufacturing Single Champion Product award in 2019 and the Silver Award in 2017—evidence that Quectel is affiliated with MIIT through "research partnerships."

27

110.    Critically, the Report does not explain how either of these awards actually create a "research partnership"—or any sort of "affiliation" for that matter—with MIIT. Indeed, the Report fails to provide the most basic description of what these awards are and how they have anything to do with military-civil fusion. Likewise, the Report fails to explain how awards granted six to eight years before the Designation create a *current* affiliation with MIIT, as required by Section 1260H.

111.    The Department failed to provide an explanation because it either failed to investigate the true nature of these awards or it ignored public information that was easily ascertainable concerning each of the awards.

112.    The Single Champion Award is awarded to companies that "focus[] on certain specific segmented product markets in the manufacturing industry for a long time, has international leading production technology and has a single product market share that ranks among the top in the world."[23] The Single Champion Award therefore simply recognizes companies that have mastered the manufacturing of a particular product and, as a result, are industry leaders.

113.    The Single Champion Award is a purely honorary recognition of a company's success as a manufacturing company that does not, by itself, provide any monetary benefits.

114.    The Single Champion Award is bestowed upon hundreds of companies in a wide array of industries—the vast majority of which do not operate in industries which are related to, or could be leveraged by, the Chinese military.[24]

---

[23] *See Single champion of manufacturing industry: Let enters. move from "market champion" to "innovation champion,"* JIE DRIVE (June 28, 2022) (citation modified), https://www.jiegroup.com/news/industry-information/zhi-zao-ye-dan-xiang-guan-jun-rang-qi-ye-cong-shi-chang-guan-jun-zou-xiang-chuang-xin-guan-jun.html.

[24] *See Notice of the two departments on the announcement of the fourth batch of mfg. single champion enters. (prods.) & the first batch of mfg. single champion enters. that passed the*

115.     Relying on criteria related to market share, time in business, and product quality, the Single Champion Award spotlights these companies for other manufacturers who want to emulate these successful business models. It does not on its own confer or create a preferential or referral status for the recipients.

116.     The award cannot be reasonably understood to be a "research partnership" or "project" or otherwise create any sort of "affiliation"—direct or indirect—with MIIT. Moreover, the award cannot be reasonably understood to be a reliable indicator of whether a company contributes to military-civil fusion and/or the Chinese defense industrial base.

117.     The Silver Award for the "2017 World Internet of Things Expo New Technology and New Product Achievement" is a purely honorary recognition awarded to Quectel's NB-IoT module for creating efficiencies for residential areas and non-military industries.

118.     Over one thousand domestic and foreign enterprises submitted projects for awards at the 2017 World Internet of Things Expo.[25] The collected projects involved smart city, smart agriculture, smart home and other fields, covering many new products and technologies such as smart terminals, smart hardware, smart applications, IoT development platforms and IoT communication—products aimed for commercial uses, and not for military uses or users.

119.     After a multi-level review process, twelve projects won gold awards, twenty-four won silver awards, and thirty-six won "winning" awards. MIIT is merely the organizing entity and does not participate in the scoring, evaluation, and determination process. Independent experts and

---

*review*, MINISTRY OF INDUS. & INFO. TECH. OF THE PEOPLE'S REPUBLIC OF CHINA (Nov. 27, 2019), https://www.miit.gov.cn/zwgk/zcwj/wjfb/tg/art/2020/art_3609530342094681bc2137e2da816ebd.html (English Translation).

[25] *Beijing Sensor Maker BeeTech Wins Silver Award for New Product at 2017 World IoT Expo,* YICAI GLOBAL (Sep. 12, 2017), https://www2.yicaiglobal.com/news/beijing-sensor-maker-beetech-wins-silver-award-for-new-product-at-2017-world-iot-expo.

29

academics made the selections for the awards. Quectel was selected for the award "[a]fter public solicitation" and "expert review."[26]

120.    The NB-IoT module Quectel created has been adopted by civil non-military customers globally, "including water meter manufacturers, parking equipment manufacturers, fire equipment manufacturers, tracker manufacturers, street light manufacturers, etc."[27] The NB-IoT module has no relevance for military uses or users. The article cited by the Report specifically emphasized that "smart" technology using the NB-IoT module has been successfully rolled out for a range of "*residential*" applications.[28]

121.    The award cannot be reasonably understood to be a "research partnership" or "project" or otherwise create any sort of "affiliation"—direct or indirect—with MIIT. The award also cannot be reasonably understood to be a reliable marker of whether a company contributes to military-civil fusion or the Chinese defense industrial base.

122.    All of the foregoing information concerning the Single Champion and Silver Awards was readily ascertainable to the Department at the time of the Designation. The Department either failed to reasonably investigate the nature and purpose of these awards or ignored clearly relevant information.

123.    The receipt of the Single Champion Award and/or the Silver Award do not reasonably support the conclusion that "MIIT is affiliated with Quectel through research partnerships" or that Quectel is otherwise "affiliated with" MIIT under any reasonable definition of the term.

---

[26] *Quectel's NB-IoT module won the silver medal at the 2017 World Internet of Things Expo*, DVBCN (Sep. 12, 2017), http://www.dvbcn.com/2017/09/12-147314.html (English Translation).

[27] *Id*.

[28] *Id*.

124.    In March 2025, Quectel provided the Department with this information in a reconsideration petition supported by a declaration from CEO Patrick Qian. Nevertheless, the Department has still refused to correct or retract this basis for the Designation. The petition and accompanying declaration are attached as Exhibit 1 and incorporated by reference herein.

125.    Specifically, Mr. Qian attested to the fact that both the Single Champion Award and the Silver Award represent "purely honorary, non-monetary recognition of the company's success as a manufacturing company." (Qian Decl. ¶¶ 15, 18). Mr. Qian assured the Department that "MIIT did not direct, participate in, oversee, or otherwise participate in Quectel's development" of its cellular wireless communication model or its NB-IoT module, nor did it direct Quectel to undertake the design of either. (*Id*. ¶¶ 16, 19).

### b.    *The Video Streaming Project and the Blooming Cup Do Not Create An Affiliation With MIIT*

126.    The Report points to Quectel's alleged "work[] with the MIIT and the Chinese Academy of Information and Communications Technology (CAICT) to carry out testing cooperation and standard formulation, including the 2019 project, 'Application of 5G Technology in Ultra-HD Live Streaming Acquisition and Transmission System at Large-scale Event Sites'" (the "Video Streaming Project"). (Report at 7). It further notes that "Quectel won the Excellence Award for the project in the final of the 2nd '"Blooming Cup"'" (the "Excellence Award"). (*Id.*).

127.    The Report again fails to explain how this project or the Excellence Award create any sort of "research partnership" or other affiliation with MIIT. It fails to explain what the Video Streaming Project is and what role (or lack thereof) MIIT had in its development.

128.    Quectel's contribution to the Video Streaming Project was use of its RM500Q 5G Sub-6GHz wireless communication module for ultra-HD video live streaming.

31

129.    MIIT had no role in the Video Streaming Project. MIIT did not fund it, did not direct Quectel to undertake it, and did not oversee its implementation or process. The Project was developed in collaboration with an American livestreaming technology company, headquartered in California.

130.    The Video Streaming Project has nothing to do with military-civil fusion. The project leveraged Quectel's 5G wireless communication network and integrated intelligent encoding and multiplexing technologies to ensure stable and reliable ultra-HD 4K video streaming and conduct ultra-HD video live streaming events, like concerts and sports, in various locations. This is wholly unrelated to any military end use applications.

131.    Quectel and its partner submitted this work to the second Blooming Cup, an international competition that was co-hosted by the MIIT along with four other organizations and received the Excellence Award. No MIIT research partnerships or projects are created by or flow from an entity's receipt of the Excellence Award.

132.    The Video Streaming Project was not intended for any sort of military application, and, the Report, accordingly, fails to provide any explanation whatsoever regarding how this project purportedly contributes to military-civil fusion or the Chinese defense industrial base.

133.    Participation in the Video Streaming Project and receipt of the Excellence Award do not reasonably support the conclusion that "MIIT is affiliated with Quectel through research partnerships" or that Quectel is otherwise "affiliated with" MIIT.

134.    The foregoing information concerning the Excellence Award and the Video Streaming Project was readily ascertainable to the Department at the time of the Designation. The Department either failed to reasonably investigate the nature and purpose of these awards or ignored clearly relevant information.

32

135.    Quectel provided the Department with the foregoing information in its March 2025 reconsideration petition, which also was supported by the aforementioned declaration from CEO Patrick Qian. Nevertheless, the Department still has refused to correct or retract this basis for the Designation.

136.    Specifically, Mr. Qian attested that "MIIT did not direct, participate in, oversee, or otherwise participate in Quectel's development of the Project nor did it direct Quectel to undertake the design or development of the technology used for the Project." (Qian Decl. ¶ 13).  Mr. Qian was clear: "the Excellence Award did not provide Quectel any direct material benefits or connection to MIIT." (*Id*. ¶ 14).

### c.    *The Department Has Not Established Quectel's Current Affiliation with MIIT Under Any Reasonable Definition of the Term*

137.    "Affiliated" in this context should be understood to mean "effectively controlled by [MIIT] or associated with [MIIT] under common ownership or control." *Xiaomi Corp.* 2021 WL 950144, at *6, *7 (holding in an analogous context that "[t]he overwhelming weight of authority," including Department regulations, "supports this definition" (citing, *inter alia*, 32 C.F.R. § 232.3 ("Defense regulation stating that an 'affiliate' is any person that controls, is controlled by, or is under common control with another person."))).

138.    The record here is devoid of any evidence that Quectel is "effectively controlled by" or "under common ownership" of the MIIT, or that any of Quectel's research or production projects are under "control" by the MIIT.

139.    Alternatively, if "affiliation" is defined as a "close formal or informal association" with, or a "close relationship" with the MIIT, the facts available to the Department likewise do not support such a finding.

140. Indeed, the Report identifies no such close "relationship" or "association." It relies solely on Quectel's receipt of three purely honorary awards given to countless other companies— conduct that does not create any current connection to MIIT and cannot reasonably be construed as establishing "affiliation" under Section 1260H or the applicable case law.

141. Moreover, the three awards and the Video Streaming Project each occurred *seven to nine years ago*. Even if these activities arguably rendered Quectel "affiliated with" MIIT then (which they did not), they certainly do not create a present affiliation with MIIT, as the plain language of Section 1260H requires.[29]

### d. *Quectel Does Not Contribute to the Chinese Defense Industrial Base*

142. The Report further claims that "Quectel contributes to the Chinese defense industrial base through its development of IoT products, to include IoT products with GPS, which are used in military equipment." (Report at 6).

143. The Report conspicuously does not allege that Quectel products are actually used in military equipment. Rather, it alleges that the products are compatible with GPS and other GNSS, which, according to the Department, includes the Chinese GNSS known as BeiDou.

144. Quectel does not provide, design, develop or modify products for military end uses or military end users. Quectel develops modules to be used in civilian IoT products *only*.

---

[29] Section 1260H requires that the Secretary of Defense identify CMCs "based on the *most recent information available*," § 1260H(a) (emphasis added) and, moreover, obligates the Secretary to make "Ongoing Revisions" to the List "based on the latest information available." § 1260H(b)(3) (emphasis added). *See also* § 1260H(a) ("[S]hall identify each entity… [that] is *operating* directly or indirectly in the United States… *that is a* Chinese military company.") (emphasis added); § 1260H(d)(2) (defining military-civil fusion contributor as entities "receiving", "residing in", as opposed to using past tense); § 1260H(d)(1)(B) (A CMC "means an entity *that is*…")) (emphasis added). *See also SZ DJI Tech. Co. Ltd. v. DOD*, Civ. A. No. 24-2970(PLF), 2025 WL 2761210, at *3, *13 (D.D.C. Sep. 26, 2025).

145.    Quectel's products do not have a "substantial military application" under any reasonable understanding of the term.

146.    OEMs procure Quectel's generic "off-the-shelf" modules when designing terminal products for civilian uses. Quectel has robust policies that ensure that anyone, including OEMs, who procures its modules (and ultimately any end users) is not relying on Quectel's modules for military applications.

147.    Once again, Quectel provided the Department with this information in its March 2025 reconsideration petition, which was supported by the declaration of CEO Patrick Qian. Nevertheless, the Department has still refused to correct or retract this basis for the Designation.

148.    Specifically, Mr. Qian attested to the fact that "BeiDou is not a Quectel customer, and Quectel does not directly provide modules or any other technology used by BeiDou." (Qian Decl. ¶ 21 ). Rather, Quectel's modules incorporate third party GNSS chipsets…which are capable of leveraging" all GNSS systems. (*Id.*). Further, "[OEMs] procure Quectel's compatible generic 'off-the-shelf' modules when designing terminal products for civilian uses." (*Id.* ¶ 22). Mr. Qian also attested to Quectel's robust end use compliance program. (*Id*. ¶ 23).

149.    The Department's conclusion that Quectel contributes to the Chinese defense industrial base because it manufactures generic components that *could* be used in certain terminal products that *could* be used with BeiDou (or any other GNSS) is not sufficiently explained and is unreasonable on its face.

150.    Even assuming, *arguendo*, that Quectel's products **can** have both commercial and military applications, that fact alone is insufficient to establish that an entity contributes to the Chinese defense industrial base. *Hesai Tech. Co. v. DOD,* 792 F. Supp. 3d 22, 40 (D.D.C. 2025).

35

151.    Indeed, the Department's Report does not contain any credible evidence of a substantial military application for Quectel's products.

152.    Moreover, as Quectel has informed the Department, civilian-designed products necessarily operate on civilian frequency bands of the BeiDou network—reinforcing that there is no possible military application for the terminal products containing Quectel's modules.

###### e.    The Report Consistently Relies on an Erroneous and Poorly Sourced Factual Record

153.    The Report contains a multitude of other material errors, which significantly undermine the credibility of the Department' investigation and the conclusions drawn therefrom. *Cf. Xiaomi Corp.*, 2021 WL 950144, at *5 (finding Department's errors "do not inspire confidence in the fastidiousness of the agency's decision-making process").

154.    The Report relies heavily on a *Newsweek* article [30] that contains numerous, significant errors, as well as stale media reports that are over five years old and do not support the Report's claims or conclusions.

155.    For example, the Report's description of Quectel's location and a groundbreaking ceremony in 2023 appears to be drawn from the *Newsweek* article, stating that Quectel's new headquarters are located "in in a state-sponsored special high-tech commercial and research and development (R&D) zone" and that attendance by government officials at the ceremony indicated "government backing of the project and the company." (Report at 4 (footnote omitted)). However, Quectel's new headquarters are located at the intersection of Sifeng Highway and Henggang Highway, Sijing Town, Songjiang District, land parcel number 26-02, a residential neighborhood

---

[30] *See* Shaun Waterman & Didi Kirsten Tatlow, *China's Plan to Rule the World of IOL Smart Devices, FCC Urged to Act*, NEWSWEEK (Aug. 8, 2023, 5:00 AM), https://www.newsweek.com/chinas-plan-rule-world-iot-smart-devices-fcc-urged-act-1817682.

not a government-sponsored high-tech zone. This information is readily available in the public domain. Further, the article's reckless leap of logic (echoed by the Report) that Quectel must have had government funding for the construction because local dignitaries attended the groundbreaking is baseless and wrong.

156.    The *Newsweek* article also relies on second and third hand accounts which are stale, biased, and inaccurate, including, conclusions from an asserted "expert" who Quectel has come to learn, on information and belief, is affiliated with two think tanks financially supported by one of Quectel's competitors and has been consistently disseminating false and inaccurate information about Quectel for years.[31]

157.    The Report further relies on a Counterpoint Research article,[32] also cited in the *Newsweek* article, when claiming "Quectel's 2022 annual report . . . acknowledged government backing of its technology." (Report at 5, n.13). The cited Counterpoint Research piece does not, however, include this quote, nor does it discuss Quectel's 2022 annual report.

---

[31] Quectel issued a cease-and-desist letter demanding that certain entities stop disseminating false and defamatory statements about Quectel regarding risks associated with its products' security and the company's purported connections to the Chinese government. *See* Press Release, QUECTEL, *Quectel issues Cease & Desist Letters to Telit Cinterion, Thales Grp., DBAY Advisors, Liberty Bell Project & Charles Parton in response to coordinated disinformation campaign against Quectel* (Jan. 5, 2026), https://www.quectel.com/news-and-pr/cease-and-desist-letters-false-defamatory-statements/.

[32] *Global Cellular IoT Module Shipments Jump 14% YoY in 2022 to Reach Highest Ever*, COUNTERPOINT RSCH. (Mar. 29, 2023), https://www.counterpointresearch.com/insights/global-cellular-iot-module-shipments-2022.

158.    Footnote 21 of the Report refers to a 2019 article,[33] published in SOHU.COM, to suggest that Quectel "worked with MIIT" on the Video Streaming Project; however, the cited article merely notes that MIIT "guided" the competition to which the project was submitted.

159.    These and other clear errors were communicated to the Department—in some cases on more than one occasion—during the reconsideration process. However, the Department has not corrected these errors and, on information and belief, has not taken any steps to further investigate the reliability of the sources cited in the Report.

160.    The Department's reliance on such inaccurate information demonstrates that it failed to support the Designation with the kind of reasonable investigation demanded by law and has not acted on the latest information available.

161.    Because the Department's conclusions as to Quectel "rest[] upon a factual premise that is unsupported by substantial evidence," the Department's Designation is arbitrary and capricious. *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) (citation omitted).

**F.    The Department Failed to Remove Quectel's Designation Despite Being in Possession of the Latest Information**

162.    As illustrated above, the Department could have ascertained, easily on its own, that its findings concerning Quectel were erroneous before the Designation.

163.    After receiving Quectel's reconsideration petition and the Qian Declaration (attached and incorporated herein as Exhibit 1) in March 2025, however, there can be no dispute that the Department was in possession of the latest information available—*i.e.,* information

---

[33] *Quectel won the Excellence Award in the final of the 2nd "Blooming Cup" 5G Application Competition*, SOHO, (Oct. 23, 2024), https://www.sohu.com/a/349059358682625 (English Translation).

demonstrating that Quectel is neither affiliated with MIIT nor does it contribute to the Chinese defense industrial base. Nevertheless, the Department has refused to act.

164.    Quectel provided even more information to the Department concerning its business and associations in email correspondence from May through November 2025. This information was also shared with the Department during an in-person presentation in January 2026. Yet, the Department has still not removed Quectel from the Section 1260H List despite its express obligations under Section 1260H to act on designations based on the "latest information available."

165.    It has now been over one year since Quectel submitted its reconsideration petition, yet the Department has not given Quectel any sign that it will correct its errors and remove the baseless Designation.

166.    Also, Section 1260H(b)(3) *requires* the Department to make deletions from the CMC List "*based on the latest information available*." (Emphasis added). When an agency fails to take a discrete agency action that it is required to take, it violates both Section 1260H and the APA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

### G.    The Designation Goes Beyond the Ambit of Section 1260H

167.    It is clear that Congress did not intend to sweep a company like Quectel into the CMC regime.

168.    The U.S. Department of State has outlined the threat posed by "military-civil fusion" to U.S. national security: "Military-Civil Fusion … is an aggressive, national strategy of the CCP. Its goal is to enable the PRC to develop the most technologically advanced military in the world."[34]

---

[34] *Military Civ. Fusion & the People's Republic of China*, U.S. DEP'T OF STATE (May 28, 2020), https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-One-Pager.pdf.

169.    The U.S. Department of State has further explained that the United States should be concerned about Military-Civil Fusion because it:

> [T]hreatens the trust, transparency, reciprocity, and shared values that underpin international science and technology collaboration and fair global business practices. In a clandestine and non-transparent manner, the CCP is acquiring the intellectual property, key research, and technological advancements of the world's citizens, researchers, scholars, and private industry in order to advance military aims.[35]

170.    There is no evidence that Quectel implicates these concerns *at all*.

171.    The conduct set forth in Section 1260H(d)(2)(A)-(F) falls into two categories. The first category encompasses entities whose primary purpose is to operate as a militaristic arm of the State. These entities are essentially extensions of the Chinese military. *See, e.g.*, § 1260H(d)(2)(D) ("[E]ntities or subsidiaries defined as a 'defense enterprise' by the State Council of the People's Republic of China."), (E) ("Entities residing in or affiliated with a military-civil fusion enterprise zone . . . ."), (G) ("Entities that advertise on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China.").

172.    The second category of entities in Section 1260H(d)(2) are those entities which, at their core, are commercial (as opposed to military) entities, but whose products can be leveraged by the Chinese military, and the Chinese government has provided the entity with some form of support to leverage those products. This includes Section 1260H(d)(2)(B). *See* § 1260H(d)(2)(A) ("knowingly receiving assistance" from the Chinese government or Chinese Communist Party through efforts "initiated under the Chinese military industrial planning apparatus"), (B) ("affiliated with the Chinese Ministry of Industry and Information Technology"), (C) ("receiving assistance, operational direction or policy guidance from the State Administration for Science,

---

[35] *Id.*

Technology and Industry for National Defense"), (E) ("receiving assistance from the Government of China through [a military-civil fusion] enterprise zone"), (F) ("awarded with receipt of military production licenses" from the Chinese government).

173.   Quectel cannot reasonably be placed in either of those categories and therefore cannot "appropriate[ly]" be designated a military-civil fusion contributor. Quectel is a commercial entity which specializes in the design, development, and manufacture of cellular modules and antennas, which serve as critical components in IoT applications. The company neither operates as an extension of the Chinese military such that the entity is effectively indiscernible from the Chinese military, nor does it in any way supply or otherwise partner with the Chinese military. It also does not receive support from the Chinese government, in the form of research partnerships or projects, in exchange for access to any sort of dual-use technology. The three awards and Video Streaming Project are clearly not evidence of such support. Moreover, as described above, Quectel's IoT components are not used for, designed, for or otherwise intended for military applications, and Quectel maintains a robust compliance program to ensure its products are not used for any downstream military use.

174.   In a report released by the Secretary of Defense, a "military-civil fusion contributor" was defined in a similar manner to include any entity that "connects the military and civilian sectors in a way that serves as a catalyst for innovation and economic development, yields an effective unity of effort in advancing dual-use technologies, especially those suited for 'intelligentized' warfare, and facilitates effective industrial mobilization during wartime." [36]

---

[36] DOD, Annual Report to Congress, *Military & Security Developments Involving The People's Republic Of China* at 28 (2023).

175.    But, again, Quectel does not meet this definition. For the reasons described above, Quectel's IoT products cannot be said to "fus[e] China's defense industrial base to its civilian technology and industrial base," and Quectel's IoT products have not been used for "military applications or to more broadly advance military [science & technology]."[37] Quectel's technology is solely designed and intended for non-military uses, and Quectel requires that its products not be used for any military use downstream. No portion of Section 1260H(d)(2) provides authority for Defendants to identify Quectel as a "military-civil fusion contributor."

176.    Further, to designate a company based on the winning of the three awards would ensnare a wide range of other companies that are likewise not CMCs. The Single Product Champion Award, for example, is given to companies in a wide array of industries, including nylon stretch yarn, manufacturing equipment, and power tool switches, confirming that it has nothing to do with contributing to military-civil fusion or China's defense industrial base.

**H.    Quectel is Immediately and Irreparably Harmed as a Direct Result of the Erroneous Designation**

177.    As a result of the Designation, Quectel has suffered significant and ongoing financial and reputational harm.

178.    The Designation has significantly damaged Quectel's relationship with existing customers. Numerous long-time Quectel customers have expressed their concerns about engaging in continued business with Quectel due to its presence on the Section 1260H List. Some of these customers have even formally ended their business relationship, specifically citing to Quectel's designation as "a Chinese military company" as the reason, even though they are not legally required to do so. Some customers have further informed Quectel that, due to the Designation,

---

[37] *Id.* at 28, 31.

they have no plans to engage with Quectel in the future. Quectel's existing and potential customers have referred to the Section 1260H List as "the blacklist" in their correspondence with Quectel.

179.   In particular, one of Quectel's key suppliers has made the significant decision to terminate its supplier relationship with Quectel for flash memory products, specifically citing the Section 1260H List and the Department's inaction on Quectel's reconsideration request as the reason why. The consequences of stopping shipment of flash memory have caused and will continue to cause substantial financial harm to Quectel."

180.   Quectel's existing and potential customers are concerned by the Designation for good reason. As explained above, Section 1260H has been used to "nam[e] and sham[e]" companies and their business partners for supposedly supporting the Chinese military. In addition, by law, after June 30, 2027, the Secretary of Defense may not "enter into, renew, or extend a contract for the procurement of goods or services *that include goods or services produced or developed*" by an entity identified on the CMC List, or an entity subject to the control of an entity identified on the CMC List. *Id*. § 805(a)(1)(B) (emphasis added). Thus, Quectel's customers will be prohibited from entering into contracts with the Department of Defense if they provide goods or services that are sourced from or developed by Quectel.

181.   The Designation also deprives Quectel of its right to bid on future contracts with the U.S. government.   As FY2024 NDAA § 805(a)(1)(A) makes clear, the Department is automatically prohibited from engaging with Quectel on future contracts due to its presence on the 1260H List. More broadly, the Designation has imposed an unwarranted public stigma on Quectel and has exposed the company to an array of other potential regulatory restrictions in the United States.

## CLAIMS FOR RELIEF

### COUNT I: The Designation of Quectel as a CMC
### Violates the APA, 5 U.S.C. § 706(2)(A)-(C)
### (Against All Defendants)

182.    Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

183.    Each of the Defendants is subject to the requirements of the APA.

184.    Defendants' designation of Quectel as a CMC constitutes final agency action that is reviewable by this Court and "for which there is no other adequate remedy."  5 U.S.C. § 704.

185.    Quectel has no adequate or available administrative remedy; in the alternative, any further effort to obtain an administrative remedy would be futile.

186.    The APA requires a reviewing court to set aside agency action that is (i) "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); (ii) "contrary to constitutional right," *id.* § 706(2)(B) or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

187.    As explained in detail above, Defendants' designation of Quectel is arbitrary and capricious and in excess of statutory authority because:

a.    Quectel's technologies and products cannot be said to contribute to the Chinese defense industrial base, as required by Section 1260H;

b.    Quectel is not "affiliated with MIIT" and does not otherwise fit any of the categories listed by Section 1260H for qualifying as a "military-civil fusion contributor;"

c.    The Department failed to examine the relevant, publicly available data, conduct a reasonable investigation to predicate the Designation, and

44

articulate a satisfactory explanation showing a rational connection between the facts found and the conclusion reached;

d.  The Department relied on dated, second- and third-hand media and biased consultant materials while disregarding the "latest information available;"

e.  The Department offered no comprehensible standard for, nor meaningful analysis of, how the asserted factual bases make Quectel a military-civil fusion contributor that contributes to the Chinese defense industrial base, and failed to explain why whatever standard it was applying justified designation of Quectel but not other similarly situated companies; and

f.  The Department did not support the Designation with substantial evidence.

188.  Defendants further violated the APA by applying new, previously unarticulated substantive criteria retroactively to years-old conduct that was lawful when undertaken. Every factual basis cited by the Department—three merely honorary awards from 2017–2019, a 2019 video-streaming project, and generic "GNSS compatibility"—predates the statute's operative criteria.

189.  The Supreme Court has squarely held that "statutory grant[s] of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Nothing in Section 1260H remotely authorizes retroactive application of new standards to past conduct. In fact, the language of Section 1260H underscores Congress's forward-looking design: it requires the Secretary to act based on "the most recent information available." Retroactive reliance on stale, outdated facts directly contravenes this statutory command.

190.    Finally, Defendants violated the APA by acting contrary to Quectel's constitutional rights as set forth in Counts V-VI, *infra.*

191.    Defendants' unlawful acts are causing and will continue to cause irreparable harm to Plaintiff and third parties. Plaintiff has no adequate alternative to review under the APA.

**COUNT II: Defendants Failed to Observe the Procedures Required by Law In Designating Quectel as a CMC in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (Against All Defendants)**

192.    Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

193.    The APA requires the reviewing court to set aside agency action that is undertaken without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

194.    Defendants failed to observe procedures required by law in making the Designation, including by: (a) failing to undertake a reasonable investigation into the basis for the Designation; (b) failing to make a sufficient finding that Quectel is a "military-civil fusion contributor to the Chinese defense industrial base," (*see* Section 1260H(d)(1)(B)(i)(II)); (c) failing to make the Designation based on the latest information available; and (d) designating Quectel as a CMC in violation of its constitutional rights (*see* Counts V-VI, *infra*).

195.    Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties. Quectel has no adequate alternative to review under the APA.

46

**COUNT III: The Department Violated the Administrative
Procedure Act, 5 U.S.C. § 706 (1) Because the Department
Failed to or has Unreasonably Delayed Removing Quectel's Designation
(Against All Defendants)**

196.    Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

197.    5 U.S.C. § 706(1) creates a cause of action to "compel agency action unlawfully withheld or unreasonably delayed." [C]laim[s] under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."[38]

198.    Pursuant to Section 1260H and rulemaking by the Department, Defendants have a discrete duty under Section 1260H(a) to: (1) ensure designations are supported by "the most recent information available;" (2) act on reconsideration requests in a reasonable time and manner; and (3) make additions or deletions to the Section 1260H List and provide an updated version of the List to Congress on an annual basis.

199.    Defendants have failed to carry out each of these discrete duties or, in the alternative, have unreasonably delayed in carrying each out.

200.    Defendants have been in possession of "the most recent information available" showing that its basis for Quectel's Designation is erroneous since at least March 2025 when Quectel submitted its reconsideration request. Yet, Defendants have failed to remove Quectel's Chinese Military Company status despite having a statutory obligation to do so.

201.    Alternatively, Defendants have unreasonably delayed removing Quectel's status in light of, *inter alia:* (1) Defendants' statutory obligation to act on the most recent information available; (2) Defendants' statutory obligation to update Congress no less than annually; (3) the

---

[38] *Norton*, 542 U.S. at 64 (alterations in original).

47

profound and existential harm a designation can have on a company and its business partners and (4) the Department's apparent efforts to announce the disposition of reconsideration petitions and new CMC designations at a time that is beneficial politically.

202.    As explained above, Defendants' unreasonable delay is further evidenced by the lack of an identifiable rationale for the reconsideration process, and Department's failure to follow a rational and consistent approach to its reconsideration process. *First,* it appears the Department unreasonably prolongs the reconsideration process as a means of examining alternative bases for designating the company, rather than acknowledging that its stated basis is inaccurate or engaging with the designated company on the merits of its request. *Second,* while the Department has previously changed or rescinded designations on a one-off basis, on information and belief, the Department is withholding the disposition of Quectel's reconsideration request until after it finalizes its annual listing of all CMC entities to Congress. *Third,* the process also, almost invariably, requires a company to initiate litigation in order to get the Department to correct an erroneous designation. Indeed, in three of the four court challenges to CMC designations, the Department has *revised* its basis for designating during the proceedings—requiring the designated company, the Executive Branch, and the courts to needlessly expend resources challenging a determination that the Department could not defend. *See Advanced Micro-Fabrication Equip. Inc. China v. U.S. Dep't of Def.*, No. 24-cv-2357 (PLF) (D.D.C. Aug. 14, 2024); *Hesai Tech. Co. v. U.S. Dep't of Def.*, No. 24-cv-1381 (PLF) (D.D.C. May 13, 2024); *SZ DJI Tech. Co., Ltd. v. U.S. Dep't of Def.*, No. 24-cv-2970 (PLF) (D.D.C. Oct. 18, 2024). In two of those cases, Defendants provided an alternative basis for designating the company during the litigation, leading to even longer delays and requiring the company to essentially re-start its legal challenge to the designation. In its efforts to avoid litigation, Quectel identified this very problem given that the

withdrawn February 2026 Notice suggests the Department may be considering relying on different grounds to designate Quectel.

203. Additionally, under Section 555(b) of the APA, agencies must conclude matters presented to them in a reasonable time, yet Defendants have taken no action for over a year despite receiving indisputable evidence that Quectel does not meet the statutory criteria for designation. 5 U.S.C. § 555(b). Defendants have also failed to provide Quectel with any notice, explanation, or statement of reasons in response to its reconsideration request in violation of Section 555(e) of the APA. *Id.* § 555(e).

204. Defendants' failure to remove Quectel's Designation has caused, and will continue to cause, ongoing harm to Quectel. Quectel has no adequate alternative to review under the APA.

**COUNT IV: The Designation of Quectel as a CMC and Failure to Correct the Erroneous Designation Was *Ultra Vires*, in Excess of the Agency's Statutory Authority (Against All Defendants)**

205. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

206. Section 1260H sets forth a specified and exclusive procedure for the Department of Defense to exercise its statutory authority to designate an entity as a CMC. As explained above, Defendants' designation of Quectel as a CMC exceeded the authority granted to the Department under the statute because Quectel does not qualify for such agency designation under the criteria set forth in Section 1260H, and the Department did not follow the statutorily mandated procedures for making the Designation. Moreover, Defendants failed to set forth an adequate basis for the Designation and, upon being presented the "latest information" concerning the factual basis for the Designation, Defendants failed to remove Quectel's Designation.

207.    Furthermore, Section 1260H sets forth clear rules and procedures for the removal of a company's status as a CMC when the most recent information available demonstrates that it does not meet the statutory definition. As explained above, Defendants departed from these rules and procedures in myriad ways including, but not limited to, by: (a) withholding a decision for an indefinite period despite a complete record, (b) failing to substantively engage with the information submitted, (c) withholding resolution of a discrete and finalized reconsideration request until a broader list of designations can be finalized and transmitted to Congress; and/or (d) preserving the Designation by shifting or revising rationales only after a designated entity seeks judicial review. Administering the statute in this manner exceeds the authority Congress conferred and renders the required removal procedures illusory.

208.    Defendants' original and continued designation of Quectel as a CMC was accordingly *ultra vires* and in excess of the Department's statutory authority.

209.    Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties.

**COUNT V: Section 1260H Violates the
Fifth Amendment as Applied to Quectel
(Against All Defendants)**

210.    Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

211.    The Fifth Amendment to the U.S. Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. At a minimum, the Due Process Clause of the Fifth Amendment requires notice and "an opportunity to be heard at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976).

50

212.    Plaintiff Quectel, as a foreign entity that has established substantial connections to the United States, is entitled to the protections of the due process clause. For example, Quectel has operations in California, employs American workers, and has substantial business relationships with U.S. entities.

213.    The Designation of Quectel as a CMC deprives Quectel of its property and liberty rights, including current and future revenue from its U.S. business partners, business relationships with U.S. suppliers, the ability to effectively operate its chosen business, the ability to contract with U.S. government agencies, the ability to contract with companies that want to do business with U.S. government agencies, as well as reputational and professional goodwill.

214.    Defendants violated Quectel's due process rights both in connection with the original Designation and, independently, through the manner in which they have administered the reconsideration process as applied to Quectel.

215.    Prior to making the Designation, the Department undertook a facially unreasonable investigation into Quectel's possible status as a CMC. It then failed to afford Quectel any notice or opportunity to respond to or be heard on the Designation despite the devastating effects an erroneous designation could have on a company like Quectel.

216.    Moreover, in making the Designation, the Department relied on criteria that, even if it were to provide a valid basis for the Designation, could apply to countless entities not designated as a CMC. In singling out Quectel, the Department has failed to rely on a clear and discernable standard that affords companies fair notice of why the Department would opt to designate one particular company and not another.

217.    After the Designation, the Department relied on a pretextual reconsideration process in order to search for a new basis to designate Quectel—rather than to actually *reconsider*

the current basis for the Designation. In doing so, the Department required Quectel to undertake substantial time and expense to respond to its requests—as Quectel continued to suffer under the Designation—while the Department had no intention of reversing course. The Department, again, failed to make a reasonable inquiry into the latest information available related to Quectel, including information provided to it as part of the reconsideration process and failed to give Quectel a meaningful opportunity to be heard.

218.    As explained above, the Department's administration of the reconsideration process with respect to Quectel separately and further violated its due process because the Department (a) withheld its decision for an indefinite period despite a complete record that plainly demonstrated the Designation was in error; (b) failed to substantively engage with the information submitted or with Quectel's repeated requests for information concerning the reconsideration process; (c) withheld resolution of Quectel's discrete and finalized reconsideration request until a broader list of designations can be finalized and transmitted to Congress; and (d) required Quectel to initiate litigation in order to foster any meaningful agency action. A process that functions in this manner is not a genuine administrative remedy; it encourages waste of government, party, and judicial resources and deprives affected entities of fair process.

219.    Attempting to preserve Quectel's Designation by re-listing on a new basis while reconsideration and judicial review of the original Designation are pending would not cure the due process violation. To the contrary, it would confirm that reconsideration operates only as a delaying mechanism rather than as a meaningful opportunity to be heard, thereby compounding the constitutional injury.

220.    Defendants' singling-out of Quectel has also deprived Quectel of equal protection of the laws. Quectel's Designation as a CMC violates Quectel's right to equal protection because

52

Quectel has been treated differently than similarly situated companies. Defendants are not empowered to cherry-pick certain companies to add to the Section 1260H List and have failed to add other similarly situated Chinese companies to the Section 1260H List. For example, there are numerous other companies presented with the "Single Champion" Award or similar awards who do business in the United States and have not been designated a CMC.

221. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties.

### COUNT VI: Section 1260H is Void for Vagueness
### (Against All Defendants)

222. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

223. As described above, Quectel is entitled to the protections of the due process clause.

224. The Due Process Clause requires that persons or entities must be given fair notice of conduct that is forbidden or required. If it does not, the statute is void-for-vagueness. Among other things, this doctrine ensures that those enforcing the law do not act in an arbitrary or discriminatory way. *See United States v. Lesh*, 107 F.4th 1239, 1249-50 (10th Cir. 2024). Section 1260H is unconstitutionally vague as applied to Quectel.

225. Section 1260H does not clearly define what it means for an entity to be "affiliated with" MIIT, nor does it articulate any intelligible standard for determining when an entity "contributes to the Chinese defense industrial base" as a "military-civil fusion contributor." As the D.C. Circuit has explained, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Lesh*, 107 F.4th at 1249 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)). Here, the statute's undefined terms permitted

Defendants to apply shifting, standardless criteria to Quectel—treating honorary awards issued years earlier, a civilian 5G video-streaming project, and the routine commercial functionality of generic IoT modules as sufficient bases for designation, even though none of this conduct could have alerted Quectel that it risked being labeled a Chinese military company.

226.    As applied to Quectel, Section 1260H therefore failed to provide fair notice of what conduct could result in designation and invited arbitrary, inconsistent enforcement. The statute's vague terms enabled Defendants to rely on inaccurate, outdated, and irrelevant information, and to treat Quectel differently than similarly situated commercial entities without any principled basis.

227.    Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1.    Declare the Designation arbitrary and capricious, *ultra vires*, and otherwise unlawful and set it aside;

2.    Remand this matter to the Department of Defense with instructions to remove Quectel's Designation;

3.    Declare that Defendants' failure to remove Quectel from the CMC List is action unlawfully withheld and/or unreasonably delayed;

4.    Declare that Defendants violated Quectel's rights under the Due Process Clause of the Fifth Amendment and Article I of the U.S. Constitution;

5.    Enjoin Defendants from taking any actions to enforce Section 1260H, including from continuing to identify Quectel as a CMC;

6.    Issue an order vacating and setting aside the Designation, permanently enjoining Defendants from implementing or enforcing that Designation, and preserving the status quo;

7.    Award Quectel its costs and reasonable attorney fees; and

8.    Grant any further relief that this Court may deem just and proper.

DATED: May 11, 2026

/s/ *Brian Fleming*
Brian J. Fleming
Wendy Wysong
(*reactivation forthcoming*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-8158
bfleming@steptoe.com
wwysong@steptoe.com


Michael G. Scavelli
(*pro hac vice* forthcoming)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
mscavelli@steptoe.com