**IN THE UNITED STATES**
**DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

QUECTEL WIRELESS SOLUTIONS CO., LTD.,

No. 8 Waipojing Road, Sijing Town,
Songjiang District, Shanghai 201601,
China

*Plaintiff*,

v.

UNITED STATES DEPARTMENT OF DEFENSE,

1400 Defense Pentagon
Washington, D.C. 20301

PETER HEGSETH, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF DEFENSE,

1000 Defense Pentagon
Washington, D.C. 20301

MICHAEL CADENAZZI, in his official capacity as ASSISTANT SECRETARY OF DEFENSE FOR INDUSTRIAL BASE POLICY,

3050 Defense Pentagon
Washington, D.C. 20301

*Defendants*.

Civil Action No. 1:26-cv-01605

**FIRST AMENDED COMPLAINT**

Plaintiff Quectel Wireless Solutions Co., Ltd. ("Quectel") brings this action against Defendants U.S. Department of Defense ("the Department"), Peter Hegseth, in his official capacity as Secretary of Defense, and Michael Cadenazzi, in his official capacity as Assistant Secretary of Defense for Industrial Base Policy, and alleges as follows:

## INTRODUCTION

1. Founded in 2010, Quectel is a global provider of Internet of Things ("IoT") solutions and wireless technology. The company specializes in the design, development, and manufacture of cellular modules and antennas used in IoT devices like car infotainment systems and other "smart" connected electronics devices. Quectel is a global company with operations in the United States and around the world. It works closely with industry-leading Original Equipment Manufacturers ("OEM") and ecosystem partners. Quectel has not—and does not—support the Chinese military or the Chinese defense industrial base in any way. It designs and manufactures purely civilian technology that is used by people and enterprises around the world.

2. This action challenges the unlawful designation of Quectel as a "Chinese military company" ("CMC") pursuant to Section 1260H(a) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("Section 1260H" and "FY2021 NDAA").[1] The January 7, 2025 designation of Quectel as a CMC (the "Original Designation") and the subsequent June 8, 2026 re-designation of Quectel as a CMC on entirely different grounds (the "Re-Designation") have caused the company serious, irreparable, and unwarranted economic, reputational, and other harm.

[1] Pub. L. No. 116-283, § 1260H(d)(1), 134 Stat. 3965 (2021) (as amended by National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118–159, §1346, 138 Stat. 2123 (2024)).

3. As soon as Quectel was originally designated, it acted to correct the Department's clear mistake. It availed itself of the Department's "reconsideration process"—which allows designated companies to provide the Department with evidence supporting removal from the Section 1260H List[2]—that was announced at the same time as the Original Designation. Counsel for Quectel emailed the Department's newly established Section 1260H electronic mailbox and asked for the administrative record supporting the Original Designation. On February 4, 2025, Quectel received a summary report setting forth the basis for the Original Designation (the "Original Report"). The Department did not provide Quectel the full administrative record.

4. The Original Report—which confined the purported basis for the Original Designation to only a few bulleted paragraphs—was replete with a wide range of factual and legal errors. Most of the errors could have (and should have) been caught by a cursory internet search.

5. On March 24, 2025, Quectel submitted a formal reconsideration request—supported by a declaration from the company's CEO and founder—which pointed out these clear and incontrovertible errors. However, instead of correcting its error, the Department used the reconsideration request as an opportunity to conduct a wide-ranging and largely irrelevant investigation of Quectel. The Department's fishing expedition included sending Quectel's counsel a series of follow-up questions, which, for the most part, had no connection to the basis set forth in the Original Report, the reconsideration request, or its subsequent re-designation of Quectel on an entirely new basis. Nevertheless, as part of its attempt to engage with the Department in good faith, Quectel carefully investigated each of the questions and provided full, transparent answers.

[2] The Section 1260H List is sometimes referred to as the Chinese Military Companies List ("CMC List" or "1260H List" or "the List"). Those terms will be used interchangeably herein.

6. In January 2026—almost ten months after Quectel submitted its reconsideration petition—Quectel secured a meeting with the Department where it reiterated these points and demonstrated to the Department that its nearly year-long mistake was gravely harming Quectel and its business partners. The presentation was met with little more than silence. The Department provided Quectel with a pro forma assurance that its request was under review. However, the Department declined to engage with the irrefutable facts that Quectel provided undermining the Original Designation. The Department further declined to provide Quectel any timeline regarding when the Department expected to act on the reconsideration request.

7. On February 13, 2026, the Department posted a pre-publication version of the Federal Register notice containing the Section 1260H List online for approximately an hour before it was withdrawn (the "February 2026 Notice"). This pre-publication version of the List appeared to maintain Quectel on the Section 1260H List but with an entirely different statutory justification.

8. On February 17, 2026, counsel for Quectel reached out to the Department to ascertain whether this publication meant that the reconsideration process was finally completed. On February 20, 2026, the Department again provided a pro forma response that it was "still processing" the reconsideration request.

9. By March 2026, Quectel could no longer wait while the Department dragged its feet. The listing and the Department's inaction in processing the reconsideration request were causing Quectel's commercial relationships to deteriorate. On March 11, 2026, Quectel provided the Department with a proposed complaint laying out all of its arguments for removal and indicated that it would file suit in 30 days if the Department continued to delay. On March 24, 2026, Quectel provided the Department with a second letter, which described the impending loss of a relationship

with a significant supplier as a result of the listing and the government's repeated failures to act on the reconsideration request.

10. In an April 22, 2026 letter, Quectel made one final, good faith attempt to engage with the Department. Quectel again highlighted the facially insufficient basis for its designation and explained that further delays would compound the ongoing harm the Original Designation was inflicting on the company. Quectel indicated that it intended to seek judicial relief but was also mindful that in virtually all prior litigation challenges to a Section 1260H listing, the Department changed the basis for the listing in the middle of the litigation—leading to months of additional delays, including the need to amend pleadings and refile briefs. Quectel stated that it wanted to avoid such an outcome and requested that the Department provide, at minimum, any new facts or bases that the Department was considering or a date certain by which it would finalize its determination. That request was particularly relevant, and reasonable, given the apparently new listing basis set forth in the February 2026 Notice. Quectel explained that this information would allow it to make an informed decision regarding if and when to seek judicial intervention. Instead of engaging with Quectel, the Department failed to respond to the letter beyond acknowledging its receipt.

11. Quectel has provided the Department with every opportunity to resolve its reconsideration request and remove the company from the 1260H List without resorting to litigation. Quectel repeatedly stated to the Department that it would be unnecessary and wasteful for Quectel to initiate litigation only for the Department to later change the asserted basis for the Original Designation. Quectel pointed to the February 2026 Notice (and the Department's conduct in other court challenges to CMC designations) as justification for its concern.

12. When the Department still failed to resolve the reconsideration request, Quectel had no other option but to initiate litigation. On May 11, 2026, Quectel filed the complaint (ECF No. 1) challenging the Department's inclusion of Quectel on the 1260H List and the Department's failure to reconsider that designation, despite its concerns that the Department intended to redesignate Quectel on new grounds at some point in the future.

13. In the end, Quectel's concerns were well justified. On June 10, 2026, the Department published the new Section 1260H List. The List maintained Quectel's designation as a CMC but completely changed the justifications for doing so.

14. Adding insult to more injury, the Department then communicated to Quectel that its ***15-month-old*** reconsideration request was now mooted by the new designation, and it would take no further action on the request.

15. Quectel promptly requested that the Department provide the administrative record underlying the Re-Designation. The Department again refused and produced only a summary report reflecting the Re-Designation (the "New Report") which revealed that the Department ***completely abandoned*** each of its prior bases for designating Quectel. In other words, Quectel had been listed as a CMC for nearly a year-and-a-half based on a designation basis that the Department could not defend. Moreover, the New Report reflected that the Department's new bases for designation were even weaker than the first. The Department asserted that Quectel is "indirectly affiliated" with the Chinese Ministry of Industry and Information Technology ("MIIT") given (a) its participation in drafting certain national and industry standards related to IoT and (b) its participation in an organization of companies working in the IoT industry. Each basis concerned alleged conduct that was years old and supported by publicly available information that pre-dated even the original listing. The New Report provided no suggestion for why the Department's

internet research was not contained in the Original Report or why the Department waited 15 months to revise a clearly erroneous basis.

16. As discussed herein, the Defendants' conduct was unlawful, and the Court should grant relief for four reasons. *First*, the Defendants' facially unreasonable Original Designation of Quectel and its failure to remove the Re-Designation violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *Second*, Defendants acted *ultra vires* and in excess of their statutory authority by designating Quectel as a CMC despite the total inapplicability to Quectel of the criteria for such designation under Section 1260H and the federal government's own pronouncements defining CMCs. *Third*, by failing to provide Quectel with notice of, or an opportunity to meaningfully challenge the basis for the Re-Designation, Defendants deprived Quectel of its property and liberty rights without due process of law, in violation of the Fifth Amendment of the U.S. Constitution. *Fourth*, Section 1260H is unconstitutionally vague as applied to Quectel because it fails to provide fair notice of what conduct may result in designation and permits arbitrary and inconsistent enforcement, in violation of the Fifth Amendment.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution and the laws of the United States, including the APA, 5 U.S.C. § 551 *et seq*.

18. The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; 5 U.S.C. § 702; and the Court's inherent equitable powers.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers or employees acting in their official

capacities, and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

20. Quectel is an independent company that is traded on the Shanghai stock exchange. Quectel has operations all over the globe. It is currently headquartered in Shanghai, China.

21. Defendant U.S. Department of Defense is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1). On January 7, 2025, the Department of Defense published a list designating Quectel as a CMC under Section 1260H.

22. Defendant Peter Hegseth is the Secretary of Defense and is sued in his official capacity.

23. Defendant Michael Cadenazzi is the Assistant Secretary of Defense for Industrial Base Policy. In this role, he manages the process for the Department's placement of entities on the Section 1260H List and the process for the Department's removal of entities from the Section 1260H List. He is sued in his official capacity.

## LEGAL FRAMEWORK AND BACKGROUND

### A. Section 1260H Requires the Secretary of Defense to Identify and Publish a List of CMCs

24. The Department's authority to designate an entity as a CMC derives from Section 1260H of the National Defense Authorization Act for Fiscal Year 2021. Pub. L. No. 116-283 § 1260H, 134 Stat. 3388, 3965 (2021), as amended by National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, Div. A, Title XIII, § 1346, 138 Stat. 1773, 2123-26 (2024).

25. Section 1260H directs the Secretary of Defense to identify Chinese military companies that operate directly or indirectly in the United States or any of its territories and

possessions. *See* FY2021 NDAA § 1260H(a). Section 1260H defines "Chinese military company" as any entity that is "(i)(I) directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army, Chinese military and paramilitary elements, security forces, police, law enforcement, border control, the People's Armed Police, the ministry of State Security (MSS), or any other organization subordinate to the Central Military Commission of the Chinese Communist Party, the Chinese Ministry of Industry and Information Technology (MIIT), the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC), or the State Administration of Science, Technology, and Industry for National Defense (SASTIND)" or "(i)(II) identified as a military-civil fusion contributor to the Chinese defense industrial base;" and "(ii) engaged in providing commercial services, manufacturing, producing, or exporting." *See* FY2021 NDAA § 1260H(g)(2)(B). [3]

26. The term "affiliated with" is defined as "in close formal or informal association." *Id.* § 1260H(g)(1).

27. The term "People's Liberation Army" is further defined as "the land, naval, and air military services, the People's Armed Police, the Strategic Support Force, the Rocket Force, and any other related security element within the Government of China or the Chinese Communist Party that the Secretary determines is appropriate." *Id.* § 1260H(g)(5).

28. The Secretary of Defense is required to identify Chinese Military Companies "based on the most recent information available." *Id.* § 1260H(a).

[3] Section 1260H was amended most recently in 2024. These amendments, among other things, defined the term "affiliated with" and changed the definition of a "Chinese military company." While the Original Designation was made before these amendments became effective in 2025, the Re-Designation was made based on Section 1260H as amended. Therefore, Quectel focuses on the language of Section 1260H as amended.

29. The Secretary is required to provide a report to Congress, concurrently published in the Federal Register, of all entities he has identified as Chinese Military Companies on an annual basis. *Id.* § 1260H(b)(1)-(2). The Secretary is further required to make additions or deletions to the "most recent list submitted [to Congress]…[not less frequently than annually] based on the most recent information available." *Id.* § 1260H(b)(3). The Secretary is further required to establish "reasonable procedures . . . to implement the provision of this section, including . . . procedures for removal of entities from the list described in subsection (b)(1)." *Id.* § 1260H(e).

30. Once this designation is made, the Secretary of Defense may reverse his determination that an entity is a CMC only after providing fifteen days' written notice to the Congressional defense committees. Moreover, none of the funds appropriated under the Further Consolidated Appropriations Act 2024 (Pub. L. No. 118-47, 138 Stat. 460 (2024)) can be used by the Department of Defense to facilitate removing a company from the Section 1260H List.

**B. The Department's Reconsideration Process**

31. Contemporaneous with the Original Designation on January 7, 2025, the Department announced a reconsideration process in which entities included in the Section 1260H List may email the Department to seek reconsideration.

32. Requests for reconsideration must include: "(1) The listed entity's name and mailing address (including email address) and an authorized representative's name and mailing address (including email address) and (2) A statement indicating the entity's intent to request reconsideration of the Department's determination, including a detailed description with supporting evidence of why the listed entity should be removed from the 1260H List." Notice of Availability of Designation of Chinese Military Companies, 90 Fed. Reg. 1105-06 (Jan. 7, 2025).

33. According to the announcement, the reconsideration process also allows entities to include "additional information such as arguments and evidence that establishes that an

insufficient basis exists for the listing or that the circumstances resulting in the listing no longer apply." *Id.* While the announcement does not provide a timeline for reconsideration, under Section 1260H(e), the Department's reconsideration procedures must be "reasonable," which would include acting on requests in a reasonable time and manner.

34. In addition to this requirement, subsection (b)(3) of Section 1260H separately requires the Department to revise the List of entities that it provides to Congress based on the most recent information available—irrespective of whether a reconsideration request has been made—no less than annually.

**C. Purpose of the Section 1260H List**

35. Various legislators have stated that the Section 1260H List furthers the twin aims of: (1) monitoring companies allegedly working with China's military, and (2) preventing U.S. industry and supply-chains from both funding those companies and relying on those companies.[4]

36. Senator Kevin Cramer, who sits on the Senate Armed Services Committee, stated publicly that the intent is to make American and international companies aware of which companies are CMCs so they will "strategically decouple"—*i.e.*, stop doing business with them.[5]

37. Representative Andy Barr, member of the Subcommittee on National Security, Illicit Finance, and International Financial Institutions, stated during a hearing with the House Foreign Affairs Committee that the purpose of the Section 1260H List (alongside the Non-SDN

---

[4] *Combatting the Generational Challenge of CCP Aggression: Hearing Before the H. Comm. on Foreign Affs.*, 118th Cong. 2 (2023) (statement of Michael McCaul, Chairman, H. Comm. Foreign Affairs) ("[T]hese companies are military companies for the CCP. And both are listed on the entities list. If BIS continues to mindlessly greenlight sensitive technology sales, the CCP has proven they will use our own inventions against us.").

[5] Kevin Cramer, *Senator Cramer Discusses Border Security, Threat of TikTok, Inflation on Fox Business*, KEVIN CRAMER U.S. SENATOR FOR NORTH DAKOTA (Mar. 12, 2024), https://www.cramer.senate.gov/news/press-releases/senator-cramer-discusses-border-security-threat-of-tiktok-inflation-on-fox-business.

Chinese Military-Industrial Complex Companies List) is "to prevent American investors from financing entities tied to the CCP[,] or these Chinese military industrial complex firms that are still included in emerging growth index funds either on U.S. exchanges or foreign stock exchanges or even through private equity or credit investments[.]"[6]

38. On September 29, 2020 (three months before the enactment of the FY2021 NDAA), House Republicans published the "China Task Force Report."[7] The report called for "[c]utting off material support of CCP military industrial base companies, including divestment from companies with ties to the CCP military."[8]

39. On December 18, 2025, several members of Congress sent a letter to Secretary Hegseth seeking the inclusion of additional companies on the Section 1260H List. The letter explained that listing entities on the Section 1260H List would "directly support Congress' intent that U.S. taxpayer funds not underwrite PRC military-industrial and internal-security or intelligence capabilities."[9]

---

[6] *Combatting the Generational Challenge of CCP Aggression: Hearing Before the H. Comm. on Foreign Affs.*, 118th Cong. 57-58 (2023) (statement of Rep. Andy Barr).

[7] Michael McCaul, Chairman, U.S. House of Representatives, 116th Cong., *China Task Force Rep.* (2020), https://foreignaffairs.house.gov/news/blog/china-task-force-report.

[8] *Id.* at 8.

[9] Letter from Members of Congress to Pete Hegseth, Secretary of Defense 1 (Dec. 18, 2025), https://chinaselectcommittee.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/12.18.25-letter-to-dow-1260h-additions.pdf

40. On June 18, 2026, Senators Rick Scott and David McCormick relied on Quectel's Re-Designation to erroneously suggest in correspondence to the Federal Communications Commission that Quectel's technology presented data privacy risks.[10]

**D. Ramifications of the Original Designation and Re-Designation**

41. Section 1260H imposes serious consequences for entities included on the CMC List.

42. As described above, the 1260H List is intended, at least in part, to "nam[e] and sham[e]"[11] the listed entities to put public pressure on these entities and all those who do business with them.

43. Moreover, Section 805 of the FY2024 NDAA contains two punitive prohibitions targeting entities included on the Section 1260H List, which will soon go into effect.[12] First, under Section 805(a)(1)(A), the Secretary of Defense may not "enter into, renew, or extend a contract for the procurement of goods, services, or technology" with an entity identified on the Section 1260H List, or an entity subject to the control of an entity identified on the Section 1260H List. *See* FY2024 NDAA § 805(a)(1)(A). This prohibition took effect on June 30, 2026. *Id*. § 805(b).

[10] *See* Letter from Sens. Rick Scott and David McCormick to Secretary Brendan Carr (June 18, 2026), https://www.rickscott.senate.gov/services/files/7C518A0D-B881-4620-A0E8-F48D4D636D7E.

[11] Jordan Brunner & Emily Weinstein, *Chinese Military-Civil Fusion and Section 1260H: Congress Incorporates Defense Contributors*, LAWFARE (May 4, 2021) ("Section 1260H focuses on strengthening the 'naming and shaming' foundation laid by Section 1237."), https://www.lawfaremedia.org/article/chinese-military-civil-fusion-and-section-1260h-congress-incorporates-defense-contributors.

[12] To implement these prohibitions, Section 805 directs the Department of Defense to amend the Defense Federal Acquisition Regulation Supplement ("DFARS") no later than one year after the enactment of FY2024 NDAA (*i.e.*, by Dec. 23, 2024) to implement prohibition (1)(A), and to amend the DFARS no later than 545 days after the enactment of FY2024 NDAA (*i.e.*, by June 19, 2025) to implement prohibition (1)(B). *See* National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, § 805(a)(4), 137 Stat. 136 (2023) ("FY2024 NDAA").

Second, under Section 805(a)(1)(B), the Secretary of Defense may not "enter into, renew, or extend a contract for the procurement of goods or services *that include goods or services produced or developed*" by an entity identified on the Section 1260H List, or an entity subject to the control of an entity identified on the Section 1260H List. *Id.* § 805(a)(1)(B) (emphasis added). This prohibition takes effect on June 30, 2027, *id.* § 805(b) and would not only apply to Quectel but would also apply to any entity that relies on Quectel's products and/or services.

44. Further, Section 536 of the Further Consolidated Appropriations Act of 2024 (Pub. L. No. 118-47, 138 Stat. 460 (2024)) states that "[n]o Federal funds made available to the Department of Homeland Security may be used to enter into a procurement contract, memorandum of understanding, or cooperative agreement with, or make a grant to, or provide a loan or guarantee to, any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ([Pub. L. No.] 116–283) or any subsidiary of such entity."

45. On March 21, 2024, during a hearing of the House Foreign Affairs Committee, then-Under Secretary of Commerce for Industry and Security Alan Estevez noted that the Bureau of Industry and Security ("BIS") generally has no interest in issuing licenses to export items to entities on the Section 1260H List, agreeing with the sentiments raised by a member of Congress during questioning.[13]

[13] *Countering China on the World Stage: Empowering American Businesses and Denying Chinese Military Our Technology: Hearing Before the H. Comm. on Foreign Affs.*, 118th Cong. (2024) (statement of Alan Estevez, Sec'y Com. for Indus. and Sec.) (confirming he was "really [not] interested in issuing licenses to do business with [CMC]s."), https://foreignaffairs.house.gov/committee-activity/hearings/countering-china-the-world-stage-empowering-american-businesses-and-denying-chinese-military-our-technology.

46. On February 26, 2026, certain members of Congress transmitted a letter to the Secretary of the U.S. Department of the Treasury encouraging the restriction of U.S. private investment in Quectel and numerous other Chinese companies by adding them to the Office of Foreign Assets Control ("OFAC") Non-SDN Chinese Military-Industrial Complex Companies List ("NS-CMIC List"). The letter's sole basis for such a restriction on Quectel was its designation as a CMC on the 1260H List.[14]

47. States have used and likely will continue to use the Section 1260H List in their own statutes to place onerous restrictions on companies like Quectel. For example, Utah Code 63L-13-201(2) states that restricted foreign entities, such as those on the Section 1260H List, are precluded from buying land in the state of Utah.

**E. Defendants' Earlier CCMC List**

48. The Department previously administered a "Communist Chinese military companies" list ("CCMC List"), under Section 1237 of the National Defense Authorization Act for Fiscal Year 1999 ("FY1999 NDAA").[15] Under Section 1237, to put a company on the CCMC List, the Department needed to establish that a person was either "owned or controlled by" or "affiliated with" the People's Liberation Army or a ministry of the government of the People's Republic of China, or was "owned or controlled by" an entity affiliated with the defense industrial base of the People's Republic of China. *See* Pub. L. No. 105-261, § 1237, 112 Stat. 2160-61.

49. As with the CMC List, the Department did not provide any explanation or factual basis for inclusion on the CCMC List, or disclose what administrative process, if any, it followed.

[14] *See* Letter from Members of Congress to Scott Bessent, Sec'y of the Treasury (Feb. 26, 2026), https://mcusercontent.com/e585eec970e20145fb02e3825/files/7a6ad5a2-d2cb-db21-59c6-a89fb52f653f/COINS_Implementation_Letter_02.26.2026.pdf.

[15] Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261, 112 Stat. 1920 (1998).

50. After the Department issued its fourth version of the CCMC List on January 14, 2021, several designated companies brought legal challenges in the U.S. District Court for the District of Columbia. *See, e.g.*, *Xiaomi Corp. v. U.S. Dep't of Def.*, No. 21-cv-00280 (D.D.C. Jan. 29, 2021); *Luokung Tech. Corp. v. U.S. Dep't of Def.*, No. 21-cv-00583 (D.D.C. Mar. 4, 2021); *Gowin Semiconductor Corp. v. U.S. Dep't of Def.*, No. 21-cv-01396 (D.D.C. May 21, 2021). Those plaintiffs alleged, among other causes of action, that the designations: (1) were arbitrary and capricious under the APA, 5 U.S.C. § 706(2); (2) were *ultra vires* and in excess of the Department's authority; and (3) violated the Due Process Clause of the Fifth Amendment.

51. In two of those cases, the U.S. District Court for the District of Columbia granted plaintiffs' motions for a preliminary injunction and motion for a temporary restraining order in early 2021. *See Xiaomi Corp.*, No. 21-cv-00280, 2021 WL 950144, at *1 (D.D.C. Mar. 12, 2021); *Luokung Tech. Corp.*, 538 F. Supp. 3d 174, 178 (D.D.C. 2021).[16] The court in *Xiaomi* notably concluded that the CCMC designation process "was deeply flawed and failed to adhere to several different [legal] requirements" and that the Department's conclusion was "plainly" not supported by substantial evidence. 2021 WL 950144, at *8.

52. The Biden administration decided on June 3, 2021, to effectively scrap the CCMC List.[17] To replace the CCMC List, the Biden administration: (1) established the OFAC, Non-SDN Chinese Military-Industrial Complex Companies List, creating a new Chinese military-industrial complex companies sanctions regime and (2) established a new list—the CMC List—pursuant to

---

[16] In the third case, *Gowin Semiconductor Corp., v. U.S. Dep't of Def.*, Gowin moved for voluntary dismissal after the Department delisted it, and all other previously designated entities, pursuant to E.O. 14032. No. 1:21-CV-01396 (RC), ECF No. 12 (D.D.C. June 25, 2021).

[17] Exec. Order No. 14032, 86 Fed. Reg. 30145 (June 3, 2021).

Section 1260H of the National Defense Authorization Act for Fiscal Year 2021, which suffers from the same (and additional) procedural defects as the CCMC List.

## FACTUAL ALLEGATIONS

### A. Quectel is an Independent, International Company with No Connections to the Chinese Military.

53. Quectel Wireless Solutions, founded in 2010, is a global provider of IoT solutions and wireless technology. Quectel specializes in the design, development, and manufacture of cellular modules and antennas, which serve as critical components in IoT applications.

54. Quectel's IoT components have applications in many industries, including asset tracking, digital signage, commercial telematics, remote monitoring, telehealth, retail, and automotive.

55. Quectel maintains the highest industry standards of security and data privacy. Quectel's products, which are designed only for personal and commercial uses, exceed industry standards and best practices in security and compliance measures.

56. Quectel does not design, develop, or modify products for military end users or end uses. Quectel enforces a strict policy of always confirming whether a customer intends to use products incorporating its components for a military purpose. If Quectel has knowledge of military use, or if any customer refuses to certify non-military use, the company refuses to sell.

57. Quectel complies with all U.S. and international export control and sanctions laws. Quectel requires its distributors and resellers to abide by the same restrictions.

58. Since its founding, Quectel has been under the control of a private individual, Patrick Qian, who is the CEO and Chairman of Quectel's Board of Directors. Patrick Qian remains the largest shareholder of Quectel. All other shareholders have holdings below 10%.

59. Patrick Qian is a permanent resident of Australia.

60. Quectel is an independent company that is traded on the Shanghai stock exchange.

61. Quectel is not aware of having received any investment funding from any entity of the PRC government since the company's founding.

62. Quectel is not and has never been owned or controlled by the PRC government, by any regional or municipal Chinese government entity, or by any entity that is owned or controlled by any Chinese government entity.

63. Quectel has never been owned or controlled by the People's Liberation Army ("PLA") or by any entity that is owned or controlled by the PLA.

64. Quectel operates internationally. Quectel is currently headquartered in Shanghai, China, and has offices, regional teams, and technical support centers across the world.

65. The United States is one of Quectel's primary markets. Quectel works closely with leading OEMs and major U.S. cellular network operators.

### B. The Select Committee on the Chinese Communist Party Peddles Erroneous and Misleading Information about Quectel, Leading Defendants to Incorrectly Designate Quectel as a CMC

66. The United States House of Representatives Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party ("the Select Committee") wrote a letter on January 3, 2024, to then-Defense Secretary Lloyd Austin and then-Treasury Secretary Janet Yellen "outlining new information on Quectel Wireless Solutions' problematic relationships with a civil-military fusion arm of the Chinese government."[18]

[18] Press Release, House Select Comm. on the CCP, *Gallagher, Krishnamoorthi Urge Admin. to Blacklist Quectel as a 'Chinese Military Company'* (Jan. 4, 2024), https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese.

67. The Select Committee letter is filled with errors and is poorly sourced. For example, the letter incorrectly states that Quectel has "multiple affiliations with MIIT."[19] This is entirely inaccurate. As stated above, Quectel is an independent company with no ties to the PRC government.

68. The Select Committee letter further misstates that "Quectel supplies IoT modules for Beidou, the PRC's GPS alternative."[20] This is incorrect.

69. The letter also includes false and hyperbolic concerns over security vulnerabilities that have no basis in fact.[21] To the contrary, as Quectel has disclosed publicly, its products were independently validated as substantially exceeding industry standards and best practices across multiple cybersecurity measures.[22]

70. Quectel's modules meet the stringent standards of regulatory and conformance bodies such as CE, Federal Communications Commission ("FCC"), the Green Climate Fund, the PCS Type Certification Review Board, Bluetooth® SIG, and the Wi-Fi Alliance. Quectel's modules have earned certifications from more than eighty leading operators worldwide. Quectel has achieved more than 200 FCC certifications in the last two years alone.

71. On January 7, 2025, the Department released a list designating fifty-six companies (not counting subsidiaries) as CMCs, including Quectel.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Press Release, Quectel, *Quectel IoT modules get high security scores from cybersecurity expert Finite State; pioneering cybersecurity transparency program begins* (Sep. 26, 2023), https://www.quectel.com/news-and-pr/iot-modules-high-security-finite-state/.

72. On January 24, 2025, through counsel, Quectel requested a copy of the full administrative record, so that it could avail itself of the Department's reconsideration process that had also been announced on January 7.

73. On January 27, 2025, counsel for Quectel received an unsigned e-mail response from the Department's "Section 1260 Mailbox" indicating that the Department would provide a "courtesy copy" of the "rationale for including Quectel on the Section 1260H List." The Department indicated that it would not provide a copy of the full administrative record and directed Quectel to make a Freedom of Information Act ("FOIA") request.

74. On February 4, 2025, counsel for Quectel received a copy of the Department's Original Report, dated December 6, 2024.

75. On February 10, 2025, Quectel submitted its FOIA request to obtain the full administrative record, which the Department would not willingly hand over.

76. The Original Report alleged that Quectel was a "military civil fusion contributor" because of its "affiliation with the Chinese Ministry of Industry and Information Technology (MIIT) in research partnerships and projects" and that it "contributes to the Chinese defense industrial base through its development of IoT products with GPS." (Original Report at 6). These assertions were (and still are) plainly false and were clearly the result of a wholly unreasonable investigation. The Original Report was also supported by an amalgamation of dated, questionable internet sources, which, even if accepted as true, did not support the Original Report's conclusions.

77. The Original Report stated that Quectel is a CMC based on its finding that Quectel is a military-civil fusion contributor to the Chinese defense industrial base. That conclusion relies, in turn, on two predicate findings, each necessary to the Original Designation: (1) Quectel is a military-civil fusion contributor "because of its affiliation with MIIT through research partnerships

and production projects," and MIIT providing Quectel "recognition and awards," (Report at 7 (citation omitted)); and (2) Quectel "contributes to the Chinese defense industrial base through its development of IoT products" because some of these products are compatible with BeiDou, China's Global Navigation Satellite System ("GNSS"). (Original Report at 6).

78. As discussed herein, each of these findings: (1) was plainly erroneous; (2) ignored easily ascertainable facts and information that undermine the accuracy of the finding; (3) was not accompanied by a sufficient explanation; (4) relied on dated, unreliable sources; (5) was not the result of a reasonable investigation; (6) was not supported by substantial evidence; and (7) relied on conduct that pre-dates the passage of Section 1260H. Additionally, when the Department was indisputably in possession of the most current information, reflecting that its basis was incorrect, the Department failed to take Quectel off the 1260H List.

79. Most glaringly, each of the three alleged recognitions used to support Quectel's "affiliation with MIIT" indisputably occurred ***six to eight years*** before the Original Designation. Moreover, none of the recognitions could in any way be understood as creating a "research partnership[]" or "production project[]" with MIIT. Each were merely honorary recognitions given to numerous companies and MIIT had no connection whatsoever to the research or production underlying the award. For instance, one of the awards—the "Silver Award"—was based on independent expert review of a civilian NB-IoT product used in applications such as smart metering, parking, lighting, and other residential and commercial functions. Another award—the "Single Champion Award"—merely recognized Quectel as one of over a thousand awardees through the years for its excellence in IoT manufacturing.

80. The last award—the Blooming Cup "Excellence Award"—was given as part of competition that MIIT did not fund, direct, or supervise. That award recognized a project that

Quectel developed with a U.S.-based livestreaming technology company for civilian uses such as concerts and sporting events. The project involved commercial video transmission technology and had no connection to military applications or military-civil fusion. Nor did receipt of an award in a competition co-hosted by MIIT create any research partnership or ongoing relationship with the ministry. The Department never explained how participation in this commercial project or receipt of an industry award could reasonably support a finding of MIIT affiliation.

81. The Department further erred in concluding that Quectel contributes to the Chinese defense industrial base because some of its Internet of Things products are compatible with virtually all global navigation satellite systems, necessarily including China's BeiDou system. The Original Report did not identify any Quectel products that are actually used by the Chinese military, nor did it present evidence that Quectel designs, develops, markets, or sells products for military end users or military end uses. Quectel's business is focused on civilian IoT modules and antennas used in commercial applications, and its products do not have a demonstrated substantial military application. As courts have recognized, the mere possibility that a commercial technology could have dual-use applications is insufficient, standing alone, to establish that a company contributes to a defense industrial base.

82. The Department's Original Designation was also undermined by its reliance on inaccurate, outdated, and poorly sourced information. The Original Report cited media articles that contained factual errors, including incorrect descriptions of Quectel's headquarters location and unsupported claims regarding government backing of the company. Other cited sources did not support the propositions for which they were referenced. These errors were brought to the Department's attention through Quectel's March 2025 reconsideration petition and supporting declaration, which provided updated information demonstrating that Quectel is neither affiliated

with MIIT nor a contributor to the Chinese defense industrial base. Nevertheless, the Department failed to correct the record or remove Quectel from the Section 1260H List despite the statute's requirement that designations and revisions be based on the latest information available.

83. From the time of the Original Designation through the present, Quectel has not met the statutory definition of a CMC. Quectel is not "owned, controlled, or beneficially owned by, or in an official or unofficial capacity acting as an agent of or on behalf of the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party" nor is it a "military-civil fusion contributor" that "contributes to the Chinese defense industrial base" under the statute.[23]

84. Defendants did not provide any prior notice to Plaintiff indicating that the Department was considering designating Quectel as a CMC prior to issuing the List on January 7, 2025. Quectel first learned of the Original Designation when the updated 1260H List was made public.

85. On March 24, 2025, counsel for Quectel submitted a letter to the Department requesting removal from the 1260H List pursuant to the Department's reconsideration process. In the letter, Quectel outlined in detail the many factual errors contained in the Report and explained why the basis for the Original Designation was without legal or factual basis. Quectel supported each of its assertions with a declaration from its CEO, Patrick Qian. This correspondence provided the Department with the most current information available regarding Quectel's business and demonstrated that the Original Designation was erroneous and could not be supported.

86. On April 8, 2025, in response to its request for removal from the 1260H List, counsel for Quectel received follow-up questions from the Department that had virtually no

[23] FY2021 NDAA § 1260H(d)(1).

relation to Quectel's reconsideration request or the Department's stated basis for the Original Designation. The Department's response failed to acknowledge the errors contained in its December 6, 2024, Original Report. On April 25, 2025, Quectel provided detailed responses to the Department's questions.

87. On May 16, 2025, Quectel requested a status update from the Department via email. On May 20, 2025, the Department responded that it was continuing to review the information, and that it would "endeavor to process the review of Quectel's reconsideration request expediently."

88. On June 2, 2025, counsel for Quectel followed up with the Department via phone. Counsel spoke with a Department attorney who could not provide any specific information about Quectel's reconsideration request despite the substantial amount of information provided by Quectel.

89. On June 4, 2025, counsel for Quectel received additional follow-up questions from the Department via email, which, again, went beyond the scope of the basis set forth in the Report.

90. On August 6, 2025, after careful investigation and review of voluminous corporate records, counsel for Quectel provided written answers to the Department's additional questions.

91. On August 11, 2025, the Department indicated that it was reviewing Quectel's responses and posed even more follow-up questions, which, again, required a substantial investigation for Quectel to respond.

92. On November 19, 2025, after a diligent investigation, counsel for Quectel provided written answers to the Department's questions of August 11, 2025.

93. With the one-year anniversary of its reconsideration request fast approaching and commercial harms mounting, counsel for Quectel followed up with the Department via email on December 12, 2025. Counsel suggested an in-person meeting with the Department to get a status

update and provide even further information that demonstrated that the Original Designation was premised on faulty information and was without legal basis.

94. Counsel met with the Department on January 13, 2026. During the meeting, counsel for Quectel provided further details that Quectel had uncovered that showed the substantial unreliability of the information on which the Department relied for the Original Designation, including additional information about a consultant affiliated with organizations paid by a Quectel competitor spreading a false narrative repeated in the Original Report about Quectel's purported military ties. Counsel also explained in further detail that the Report's conclusions that Quectel is a military-civil fusion contributor and contributes to the Chinese defense industrial base rely on erroneous facts and legal principles. During the meeting, Department representatives declined to provide any additional information about Quectel's status and could only confirm that the reconsideration request was still being reviewed. Indeed, the meeting was essentially a one-way conversation with minimal and perfunctory engagement from the Department's representatives.

95. On February 13, 2026, a pre-publication version of a Federal Register notice with an updated Section 1260H List was made available for public inspection. That version of the List indicated that Quectel remained designated but pursuant to a new statutory basis. At no point during the reconsideration process had the Department indicated to Quectel or its counsel that it was considering this alternative basis under the amended 2025 version of the statute.

96. Approximately one hour after the February 2026 Notice was posted, the revised Section 1260H List was withdrawn by the Department.

97. On information and belief, and as later reported in the media, the withdrawal of the List was done at the insistence of the White House given, among other things, the forthcoming trade summit between the United States and China in May 2026. Following the White House's

backpedaling, officials responsible for updating the List wanted to wait for the "dust to settle[]" before publishing a new list.[24]

98. On February 17, 2026, counsel for Quectel inquired of the Department as to whether this meant that the reconsideration process had been completed. In response, on February 20, 2026, the Department continued to obfuscate. It stated:

> The Department is currently still processing Quectel's reconsideration request. It came to the attention of the Department that the 1260H list posted for public inspection on the Federal Register on February 13 may require updates based on the statutory requirement to review the most recent information available. The Department is consistently reviewing the most recent information available. The Department will publish an updated list in accordance with the statute to make additions or deletions as the Secretary deems appropriate.

99. On March 11, 2026, Quectel transmitted a letter along with a proposed complaint—advising the Department of its intent to initiate litigation if Quectel was not removed from the Section 1260H List within 30 days. Counsel emphasized that as Quectel waited to hear from the Department, it was suffering cascading damage, including the imminent loss of a major supplier, making the urgency of the request even greater.

100. On March 24, 2026, counsel for Quectel sent an additional letter detailing the specific and imminent harm affecting Quectel, its business partners, and American automobile manufacturing as a direct consequence of the Original Designation.

101. The March 24 letter explained that one of Quectel's U.S.-based suppliers had expressed concerns regarding the Department's continued inaction with respect to the Designation and made the decision to terminate its relationship with Quectel for flash memory products. The letter further explained that this disruption would not only lead to significant lost revenue for

---

[24] Kate O'Keeffe, *Frail Trump-Xi Truce Highlighted by Pentagon's Botched Blacklist*, Bloomberg (May 6, 2026), https://news.bloombergtax.com/capital-markets/pentagons-botched-blacklist-highlights-frail-trump-xi-truce?context=search&index=1.

Quectel, but that the impact would be felt by many downstream suppliers and manufacturers in the U.S. automobile manufacturing industry.

102. The Department failed to respond to either letter beyond acknowledging receipt. On April 15, 2026, counsel for Quectel contacted the Department by phone to understand whether the Department had any intention of responding. During that call, counsel reiterated Quectel's concerns regarding the adequacy of the reconsideration process, including the inefficiency and potential prejudice of filing suit before the Department finalized its position.

103. On April 17, 2026, the Department provided a short email response to the points raised by Quectel's counsel during the April 15 phone conversation. The Department stated only that it could not determine when its review would be complete or when the updated 1260H List would be published in the Federal Register.

104. In a final effort to avail itself of the Department's reconsideration process and avoid unnecessary litigation, Quectel sent a letter on April 22, 2026, notifying the Department that (1) any attempt to revise the basis for Quectel's listing would be erroneous and in violation of both Section 1260H and the APA, and (2) its failure to reasonably engage with Quectel deprived Quectel of a fair and reasonable process for the adjudication of its reconsideration request. Quectel requested that, no later than April 29, 2026, the Department provide, at a minimum, a date certain by which it will finalize its reconsideration determination, and identification of any current factual bases or statutory grounds on which the Department would rely so that Quectel may be heard before it had to resort to litigation. In other words, Quectel gave the Department every opportunity to avoid the situation it has now placed Quectel in: being designated, seeking reconsideration through a long, drawn-out process, being stonewalled by the Department, and filing a lawsuit only to have the Department abandon the Original Designation and now allege completely new bases.

Quectel's attempt to engage with the Department to avoid the need for litigation resulted in the Department wasting time and resources of the parties by forcing Quectel to challenge the Original Designation and now having to shift to challenge the Re-Designation.

105. The Department acknowledged receipt of Quectel's letter on April 23, 2026. Despite ample notice of Quectel's intention to file suit, the Department failed to respond by the April 29 deadline.

106. Quectel engaged with the Department in good faith for a year and a half. It availed itself of the reconsideration process that the Department established at the time of its Original Designation. Quectel provided detailed responses to request after request from the Department—incurring significant amounts of time and cost—even where most of those requests had no apparent connection to the basis set forth in the Report that was currently being "reconsidered."

107. The failure to promptly remove Quectel confirms that this process is nothing more than a bureaucratic fig leaf intended to convince this Court that the Department afforded Quectel due process. It most certainly did not.

108. Indeed, the reconsideration process seems only to serve as a mechanism for the Department to drag out the process, conduct additional research on companies designated as CMCs, and develop additional theories for designating those companies. When this drawn-out process finally leaves companies no choice but to challenge the designation in court, the Department simply changes the bases—rendering moot all of the time and effort spent by the company in challenging the designation.

109. Many of the sources on which the Department now relies upon for the New Report were available when the Department issued the Original Report. Had the Department been even remotely thorough and diligent, it could have included the bases in the New Report in the Original

Report. Instead, the Department rested on the flimsy bases contained in the Original Report that it now does not even attempt to defend. The Department has gamed the system so that it can continue to list companies like Quectel indefinitely under new and different theories, continually shifting the target when challenged.

110. Far from actually being a true "reconsideration" process, the Department stood firm on its stale, dubious, and at times facially erroneous sources to manufacture a listing basis that did not meet the legal requirements of the statute. It gave Quectel no opportunity to be heard before inflicting the injurious listing on it.

111. When Quectel then, in good faith, provided detailed information about how and why the listing was wrong, the Department failed to immediately withdraw the erroneous Original Designation. Rather, the Department used the reconsideration process to further investigate Quectel *for months* in the hope of finding a new basis to maintain the Original Designation.

112. By its nature, the reconsideration process is, thus, woefully inadequate. This inadequacy is highlighted by the Department's refusal to defend the Original Designation before this Court—the only way for a designated company to get relief is by court action.

113. Because Quectel had no adequate available administrative remedy, and had exhausted its administrative remedies, informally and formally, Quectel was left with no choice but to file the instant lawsuit on May 11, 2026.

**C. The Department Wrongly Designated Quectel as a CMC Again in 2026 on a Completely New Basis**

114. Despite the fact that counsel for Quectel spent months explaining to the Department why the Original Designation was wrong, the Department did not voluntarily act to remove Quectel from the 1260H List. Instead, the Department forced Quectel to file a lawsuit in order to correct the Department's mistakes and vindicate its rights. But, after Quectel filed its lawsuit on

May 11, 2026, and before the Department was even required to file its answer, the Department reversed course.

115. On June 8, 2026, the Department issued a new 1260H List, which again designated Quectel as a CMC.

116. On June 10, 2026, the Department sent counsel for Quectel a letter (dated June 5), which noted that Quectel's request for reconsideration was rendered moot as a result of the Re-Designation.

117. On June 16, 2026, after 16 months of waiting, the Department's FOIA Officer finally responded to Quectel. But even after such a long delay, the only document returned to Quectel was the Original Report. Setting aside that it strains credulity for the Department to have no other documents supporting its rationale for Quectel's placement on the CMC List, the Department itself was the one to tell Quectel to file a FOIA request to receive the administrative record but was now stonewalling Quectel via that very same process. On July 10, 2026, Quectel appealed this decision—arguing, among other things, that the Department failed to produce its source material, communications, and other important documents.

118. On June 24, 2026, counsel for the Department sent to counsel for Quectel the New Report explaining the Department's basis to claim that Quectel is a CMC. Counsel did not provide the administrative record. Accordingly, on July 10, 2026, Quectel submitted another FOIA request for the administrative record and other documents relevant to the Original Designation and the Re-Designation. On July 27, 2026, the Department sent Quectel an Interim Response, stating that it "will not be able to respond within FOIA's 20-day statutory time period as there are unusual circumstances which impact [its] ability to quickly process [the] request." The Department

reported that the request "is being worked on based on the order in which the request was received" and is currently one of "approximately 3,683 open requests."

119. That New Report completely abandoned the Department's prior bases that were outlined in the Original Report.[25] In other words, the Department no longer stands by ***any*** basis described in the Original Report and none of those original bases support the Re-Designation. The Department's about-face is plainly an admission that Quectel was entirely correct about the errors and problems with the Original Designation and Original Report. The Department did not want to litigate those infirmities before this Court and chose to invent a completely new theory for how Quectel qualifies as a CMC in order to prolong the listing.

120. The New Report contains two new theories for why Quectel qualifies as a CMC. As a preliminary matter, the Department somehow claims in the New Report that it has "identified new information that Quectel is not [sic] affiliated with the MIIT." However, many sources cited for the "new information" were available in 2023 and 2024, before the Original Report was written.

121. First, the New Report concludes "Quectel is indirectly affiliated with MIIT through the development of multiple national standards under the authority of MIIT[.]" The New Report provides sparse support for this conclusion—alleging that Quectel served as a "drafting unit" for two national standards and one industry standard broadly related to the production of IoT products. Neither the New Report nor the sources on which it relies explain what a "drafting unit" is or explain, in any way, what interaction—direct or indirect—Quectel had with MIIT in connection with these standards.

[25] The Department has used this same tactic with other entities listed on the 1260H List. For example, the Department has previously listed certain entities as a CMC under the theory that they have received awards that were affiliated with MIIT. However, after the entities challenged that designation, the Department (like here) walked away from that theory.

122. Even crediting the Department's allegations, participation in a standards review process that happens to fall under the "authority" of MIIT cannot reasonably be considered a close formal or informal association with MIIT. As the New Report itself makes clear, these standards review processes include government agencies, industry associations, private companies, and research institutions. Indeed, the Department's sources explain that China's standards-development process operates through technical committees composed of both public- and private-sector participants and that much of the technical drafting work is performed by private-sector experts. The same sources further explain that China has deliberately expanded private-sector participation in standards-setting because industry possesses the technical expertise necessary to develop modern technology standards. Against that backdrop, the fact that Quectel was identified as a "drafting unit" demonstrates only that it was one participant among many in a broader standards-development effort. If participation in such a process were sufficient to establish affiliation, then every company, association, university, research institute, and technical expert involved in standards development would be deemed "affiliated with" MIIT, rendering the term "affiliated" effectively limitless and untethered from any meaningful requirement of a close association.

123. In fact, as the Department's own sources confirm, Quectel was one of numerous international companies that participated in the review of these standards. Other companies involved in the drafting of these standards—but not included on the Section 1260H List—included Yamaha, Toyota, Nissan, as well as prominent U.S. companies Qualcomm and Keysight.

124. The Department identifies no evidence of a formal relationship between Quectel and MIIT. It does not allege that MIIT owns any interest in Quectel, exercises control over Quectel, appoints its officers or directors, directs its operations, or maintains any ongoing institutional

relationship with the company. Nor does it identify any other sort of formal arrangement that might support a close association between Quectel and MIIT.

125. The Department's evidence likewise fails to establish a close informal association. The standards cited were implemented in 2023, 2024, and 2025, and the Department does not identify any current or continuing role by Quectel in their administration, enforcement, or revision. Nor does it provide evidence of recurring coordination, preferential access, special influence, exclusive participation rights, or any other facts suggesting an ongoing relationship between Quectel and MIIT. To the contrary, the Department's sources describe a standards ecosystem involving broad participation by numerous stakeholders, with the government acting, at best, as passive stakeholder rather than engaging in exclusive relationships with particular firms.

126. The Department's reliance on China Standards 2035 and China's broader industrial policies does not bridge this gap. Those policies describe the PRC's use of standards development as a national economic strategy involving participation by government entities, private companies, industry groups, and research institutions. The Department's sources expressly acknowledge that China has encouraged greater private-sector participation in standards-setting and that much of the work is now driven by private-sector experts, even if under the authority of government institutions. But the existence of a government policy encouraging private-sector participation in standards development does not transform every participating company into an affiliate of the government agency responsible for overseeing the process.

127. In fact, as the Department's own sources reveal, none of the three alleged standards even have the force of law. Each is merely a "recommended" standard that is drafted and reviewed by a technical committee and issued by an administrative authority.

128. Again, this sort of loose interaction does not give rise to a "close formal or informal association" with, or a "close relationship" with MIIT. If such conduct created a close association, the Department should have designated the numerous other international companies and other participants who were also involved in the standards setting process. That the Department did not list those other entities belies the Department's conclusory claim that Quectel is affiliated with MIIT.

129. Moreover, had the Department conducted a reasonable investigation into this issue, it would have learned that Quectel's role as a "drafting unit" was *de minimis*. Quectel did not lead the drafting of any of the three referenced standards; rather, it merely provided comments, most of which related to information about existing industry modules. In addition, Quectel's involvement in the drafting of each standard ended no later than 2023, even though the most recent standard was not published until 2025. Notwithstanding the Department's unreasonable investigation into these matters, the Department was informed of each of these facts in an August 4, 2026 letter from counsel for Quectel, supported by a declaration by Quectel's CEO Patrick Qian (the "August 4 Letter").

130. The August 4 Letter not only explained the legal and factual shortcomings of the Re-Designation described above but also informed the Department that Quectel had formally withdrawn itself from consideration for any future standard-drafting roles with the organizations responsible for the standards at issue—eliminating this (improper) basis for asserting a present association between Quectel and MIIT.

131. Second, the New Report concludes "Quectel is indirectly affiliated with MIIT . . . through participation in the IoT Alliance with a scientific research institute subordinate to MIIT." Again, the New Report provides sparse support for its allegations. It merely alleges that Quectel

was an initial member of the IoT Alliance alongside the China Academy of Information and Communications Technology ("CAICT") and other industry actors. The Department does not (because it cannot) explain how such participation creates any sort of connection with MIIT, nor does it provide any evidence for Quectel participating in the IoT Alliance after 2023.

132. The IoT Alliance is a broad industry organization composed of multiple participants from across the communications sector. The Department itself states that the alliance was jointly established by CAICT, Quectel, and "other core companies in the communications industry." Its stated purpose is to promote industry development, address common technical challenges, and strengthen coordination across the mobile IoT ecosystem. These objectives are industry-wide in nature and necessarily require participation by numerous companies and institutions. Quectel's membership in such an organization therefore demonstrates, at best, participation in a collaborative industry forum, not a close association with MIIT.

133. The Department identifies no direct relationship between Quectel and MIIT. Rather, it relies on Quectel's relationship with CAICT, which it alleges is "subordinate" to MIIT. But affiliation—direct or indirect—cannot be established through such a chain of attenuated connections. The fact that a private company participates in an alliance with a research institute that is subordinate to a government ministry does not mean the company is thereby affiliated with the ministry. If that were the rule, then every company participating in a consortium, standards body, research initiative, or trade association alongside CAICT would be deemed affiliated with MIIT regardless of the nature or extent of its actual interactions with the ministry.

134. The Department's evidence likewise fails to establish a close informal association. Again, the Department identifies no facts showing ongoing coordination between Quectel and MIIT, preferential access to government decision-makers, special influence over ministry policies,

or any other possible indicia of a close working relationship. The allegation that Quectel collaborates with other alliance members, including CAICT, on research, innovation, and industry promotion activities is consistent with the ordinary functions of an industry alliance. Such activities do not demonstrate a unique or unusually close relationship with MIIT; rather, they reflect the type of cooperation that exists among participants in many industry organizations around the world.

135. The Department's argument improperly conflates participation in an industry ecosystem that has a government-affiliated participant with affiliation to the government itself. The cited evidence shows only that CAICT works alongside private companies in connection with activities like technical research. The mere allegation that CAICT is connected to MIIT does not mean that every company interacting with CAICT in connection with these activities is thereby affiliated with MIIT. Even accepting that CAICT is a government agency, government agencies routinely interact with private-sector companies through research institutes, advisory groups, testing programs, standards organizations, and industry alliances. Such interactions may demonstrate engagement with a sector, but they do not establish the close formal or informal association necessary to constitute affiliation.

136. Indeed, together the three internet sources on which the New Report relies in support of this conclusion say nothing more collectively than that CAICT is subordinated to MIIT and CAICT and Quectel are both members of the IoT Alliance.

137. Again, had the Department done a reasonable investigation into this basis, it also would have learned that Quectel did not have any interactions with MIIT during its work with the IoT Alliance. It also would have learned that Quectel's participation in the alliance was significantly limited and involved expressing general views about IoT development in certain

meetings during 2023. Notwithstanding the Department's unreasonable investigation into these matters, the Department was informed of each of these facts in the August 4 Letter.

138. The August 4 Letter not only explained the legal and factual shortcomings of the Re-Designation described above, but also informed the Department that Quectel had formally withdrawn itself from the IoT Alliance in the wake of the Re-Designation—eliminating this (improper) basis for asserting a present association between Quectel and MIIT.

139. Indeed, with respect to both bases, the Department did not even need to do a reasonable investigation to learn these facts because Quectel specifically offered to provide these facts to them. In the April 22, 2026 letter, Quectel offered to provide information on any alternative basis that the Department might have been considering. But the Department declined to engage with Quectel and proceeded forward with a clearly erroneous, inadequately investigated, and pre-ordained basis in order to perpetuate Quectel's listing.

140. When viewed through the lens of Section 1260H's statutory purpose, these make-weight designation bases become even more implausible. Section 1260H is intended to identify companies allegedly working to further Chinese military policy and to prevent U.S. industry and supply chains from funding or relying on those companies. The establishment of standards related to the testing of "hands-free calling and voice interaction in road vehicles" has zero relevance to these objectives. The same can be said for Quectel's participation in an industry group supporting the development of technologies used to power car infotainment systems, smart appliances, and the like. The New Report does not even attempt to explain why it singled out Quectel among the countless other similarly situated companies.

### D. Quectel is Immediately and Irreparably Harmed as a Direct Result of the Erroneous Re-Designation

141. As a result of the Original Designation and the Re-Designation, Quectel has suffered significant and ongoing financial and reputational harm.

142. The Re-Designation has significantly damaged Quectel's relationship with existing customers. Numerous long-time Quectel customers have expressed their concerns about engaging in continued business with Quectel due to its presence on the Section 1260H List. Customers have even formally ended their business relationship, specifically citing to Quectel's designation as "a Chinese military company" as the reason, even though they are not legally required to do so. Customers have further informed Quectel that, due to the Re-Designation, they have no plans to engage with Quectel in the future. Quectel's existing and potential customers have referred to the Section 1260H List as "the blacklist" in their correspondence with Quectel.

143. For instance, one of Quectel's key suppliers has made the significant decision to terminate its supplier relationship with Quectel for flash memory products, specifically citing the Section 1260H List and the Department's inaction on Quectel's reconsideration request as the reason why. The consequences of stopping shipment of flash memory have caused and will continue to cause substantial financial harm to Quectel.

144. Quectel's existing and potential customers are concerned by the Designation for good reason. As explained above, Section 1260H has been used to "nam[e] and sham[e]" companies and their business partners for supposedly supporting the Chinese military. In addition, by law, after June 30, 2027, the Secretary of Defense may not "enter into, renew, or extend a contract for the procurement of goods or services *that include goods or services produced or developed*" by an entity identified on the CMC List, or an entity subject to the control of an entity identified on the CMC List. FY2024 NDAA § 805(a)(1)(B) (emphasis added). Thus, Quectel's

customers will be prohibited from entering into contracts with the Department of Defense if they provide goods or services that are sourced from or developed by Quectel.

145. The Re-Designation also deprives Quectel of its right to bid on future contracts with the U.S. government. As FY2024 NDAA § 805(a)(1)(A) makes clear, the Department is automatically prohibited from engaging with Quectel on future contracts due to its presence on the 1260H List. More broadly, the Re-Designation has imposed an unwarranted public stigma on Quectel and has exposed the company to an array of other potential regulatory restrictions in the United States. For example, Senator Rick Scott has asked for the FCC to investigate Quectel based on its inclusion on the 1260H List. This letter relies on Quectel's status as a CMC to suggest that Quectel is somehow leaking U.S. citizens' health data to the Chinese government. These allegations are categorically false. But regardless, they are clouding the marketplace to Quectel's detriment. The continued attempts to cast Quectel as a nefarious CMC only serve further harm Quectel as a result of the Re-Designation.

## CLAIMS FOR RELIEF

### COUNT I: The Re-Designation of Quectel as a CMC Violates the APA, 5 U.S.C. § 706(2)(A)-(C) (Against All Defendants)

146. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

147. Each of the Defendants is subject to the requirements of the APA.

148. Defendants' Re-Designation of Quectel as a CMC constitutes final agency action that is reviewable by this Court and "for which there is no other adequate remedy." 5 U.S.C. § 704.

149. Quectel has no adequate or available administrative remedy; in the alternative, any further effort to obtain an administrative remedy would be futile.

150. The APA requires a reviewing court to set aside agency action that is (i) "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); (ii) "contrary to constitutional right," *id.* § 706(2)(B) or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

151. As explained in detail above, Defendants' June 2026 Re-Designation of Quectel is arbitrary and capricious and in excess of statutory authority because Quectel is not "directly or indirectly . . . affiliated with MIIT" and does not otherwise fit any of the categories listed by Section 1260H for qualifying as a "Chinese military company."

152. The Department's Re-Designation rests on allegations that Quectel: (a) participated in drafting certain national and industry standards under the authority of MIIT; and (b) participated in the IoT Alliance alongside CAICT, an institute subordinate to MIIT. Both alleged bases are arbitrary and capricious for multiple reasons:

i. The Department failed to examine the relevant, publicly available data, conduct a reasonable investigation to predicate the Re-Designation, and articulate a satisfactory explanation showing a rational connection between the facts found and the conclusion reached.

ii. The Department failed to articulate a reasoned basis for concluding that participation in standards-setting activities constitutes "affiliation" with MIIT as opposed to ordinary participation in industry-wide technical standardization efforts that involve numerous commercial entities. The Department further failed to explain how participation in such activities—which are directed toward developing commercial telecommunications and technology standards—has any connection to the Chinese military, the PLA, military-civil fusion, or the Chinese defense

industrial base. The Department likewise failed to explain how such past conduct can establish a present affiliation with MIIT, particularly where Section 1260H requires designation decisions to be based on the "latest information available."

iii. The Department failed to explain why past involvement in an industry alliance that includes CAICT creates affiliation with MIIT. Nor did the Department identify any evidence that the IoT Alliance engages in military activities, supports the Chinese military, contributes to the Chinese defense industrial base, or otherwise serves military-civil fusion objectives.

iv. The Department did not support the Re-Designation with substantial evidence.

v. The Re-Designation was the result of a pre-ordained process that involved political considerations and other improper bases.

vi. The Department designated Quectel as a CMC in violation of its constitutional rights (*see* Count V, *infra*).

153. Moreover, the Department's interpretation of "indirect affiliation" lacks any limiting principle and thus "fails to articulate a comprehensible standard." *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 700 (D.C. Cir. 2018). Under the Department's theory, participation in standards-development activities conducted under MIIT authority and membership in industry-development alliances involving entities supposedly linked with MIIT are sufficient to establish affiliation. Yet such activities involve numerous domestic and foreign companies that have not been designated under Section 1260H. The Department has failed to explain why Quectel's participation renders it "affiliated" with MIIT while other similarly situated entities engaged in the same activities have not been designated CMCs. Such unexplained line-drawing is arbitrary and capricious. *See ACA Int'l*, 885 F.3d at 700 ("If a 'purported standard is indiscriminate

and offers no meaningful guidance' to affected parties, it will fail 'the requirement of reasoned decisionmaking.' That will be the case if an agency cannot satisfactorily explain why a challenged standard embraces one potential application but leaves out another, seemingly similar one." (internal citations omitted)).

154. The Department further acted arbitrarily and capriciously by abandoning the factual and legal rationale set forth in its Original Designation and replacing that rationale with an entirely different theory after Quectel challenged the Original Designation and demonstrated its deficiencies. The Department's reversal of position confirms that the original rationale could not withstand scrutiny and further demonstrates the absence of reasoned decision-making.

155. The Department further violated the APA by applying new, previously unarticulated substantive criteria retroactively to past conduct that was indisputably lawful when undertaken, while failing to consider the most recent information available.

156. Finally, Defendants violated the APA by acting contrary to Quectel's constitutional rights as set forth in Counts V-VI, *infra.*

157. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Plaintiff and third parties. Plaintiff has no adequate alternative to review under the APA.

**COUNT II: Defendants Failed to Observe the Procedures Required by Law In Designating Quectel as a CMC in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (Against All Defendants)**

158. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

159. The APA requires the reviewing court to set aside agency action that is undertaken without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

160. Defendants failed to observe procedures required by law in making the Re-Designation, including by: (a) failing to undertake a reasonable investigation into the basis for the Re-Designation; (b) failing to rely on the latest information available in a reasoned manner; and (c) failing to otherwise implement and abide by reasonable procedures for the reconsideration process as required by Section 1260H and the APA.

161. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties. Quectel has no adequate alternative to review under the APA.

**COUNT III: The Department Violated the Administrative Procedure Act, 5 U.S.C. § 706(1) Because the Department Failed to or has Unreasonably Delayed Removing Quectel From the CMC List (Against All Defendants)**

162. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

163. 5 U.S.C. § 706(1) creates a cause of action to "compel agency action unlawfully withheld or unreasonably delayed." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (alterations in original).

164. Pursuant to Section 1260H and rulemaking by the Department, Defendants have a discrete duty under Section 1260H(a) to: (1) ensure designations are supported by "the most recent information available;" (2) act on reconsideration requests in a reasonable time and manner; and (3) make additions or deletions to the Section 1260H List and provide an updated version of the List to Congress on an annual basis.

165. Defendants have failed to carry out each of these discrete duties or, in the alternative, have unreasonably delayed in carrying each out.

166. Given the dates of the publicly-available sources on which the Defendants have relied in connection with the Original Designation and the Re-Designation and given the

substantial information provided to Defendants by Quectel, Defendants have had access to "the most recent information available" demonstrating that Quectel should not be listed since at least March 2025 when Quectel submitted its reconsideration request. Yet, Defendants have failed to remove Quectel's Chinese Military Company status despite having a statutory obligation to do so.

167. Since that time, Quectel has continued to provide information to the Department that it has continued to ignore despite its statutory obligations to consider the most "recent information available." Most recently, the August 4 Letter explained in detail why the Re-Designation was erroneous and further explained that Quectel had formally withdrawn from any and all standards-setting activities and the IoT alliance— eliminating these (improper) bases for asserting a present association between Quectel and MIIT.

168. Alternatively, Defendants have unreasonably delayed removing Quectel's status in light of, *inter alia:* (1) Defendants' statutory obligation to act on the most recent information available; (2) Defendants' statutory obligation to update Congress no less than annually; (3) the profound and existential harm a designation can have on a company and its business partners; and (4) the Department's eventual abandonment of the factual and legal basis underlying the Original Designation.

169. As explained above, Defendants' unreasonable delay is further evidenced by the lack of an identifiable criteria or timeline for the reconsideration process, and Department's failure to follow a rational and consistent approach to its reconsideration process. *First,* it appears the Department unreasonably prolongs the reconsideration process as a means of examining alternative bases for designating the company, rather than acknowledging that its stated basis is inaccurate or engaging with the designated company on the merits of its request. *Second,* while the Department has previously changed or rescinded designations on a one-off basis, on

information and belief, the Department withheld the disposition of Quectel's reconsideration request until after it finalized its annual listing of all CMC entities to Congress. Indeed, public reports indicate that the Department's Section 1260H designations have been driven by political considerations, including pressure from the White House, rather than the Department's statutory mandate.[26] This is further evidenced by the Department's refusal to meet with Quectel to discuss the basis for the Re-Designation before releasing its updated designations in June 2026. *Third,* the process also, almost invariably, requires a company to initiate litigation in order to get the Department to correct an erroneous designation. Indeed, in this case, and in three of the four other court challenges to CMC designations, the Department has *revised* its basis for designating during the litigation—requiring the designated company, the Executive Branch, and the courts to needlessly expend resources challenging a determination that the Department could not defend. *See Advanced Micro-Fabrication Equip. Inc. China v. U.S. Dep't of Def.*, No. 24-cv-2357 (PLF) (D.D.C. Aug. 14, 2024); *Hesai Tech. Co., Ltd. v. U.S. Dep't of Def.*, No. 24-cv-1381 (PLF) (D.D.C. May 13, 2024); *SZ DJI Tech. Co., Ltd. v. U.S. Dep't of Def.*, No. 24-cv-2970 (PLF) (D.D.C. Oct. 18, 2024). Here, and in two of the other cases, Defendants provided an alternative basis for designating the company during the litigation, leading to even longer delays and requiring the company to essentially re-start its legal challenge to the designation. In its efforts to avoid litigation, Quectel identified this very problem, but Defendants disregarded those concerns, forced Quectel to litigate the Original Designation, and then substituted an entirely new theory after suit was filed.

---

[26] *See* Kate O'Keeffe, *Frail Trump-Xi Truce Highlighted by Pentagon's Botched Blacklist*, Bloomberg (May 7, 2026), https://news.bloombergtax.com/capital-markets/pentagons-botched-blacklist-highlights-frail-trump-xi-truce?context=search&index=1; Josh Rogin, *The next phase in the U.S.-China economic war is here*, The Cable (Jun. 23, 2026), https://thecable.news/p/the-next-phase-in-the-us-china-economic.

170. Additionally, under Section 555(b) of the APA, agencies must conclude matters presented to them in a reasonable time, yet Defendants have taken no action for over a year despite receiving indisputable evidence that Quectel does not meet the statutory criteria for designation. 5 U.S.C. § 555(b).

171. Defendants' continued failure to remove Quectel from the Section 1260H List has caused, and will continue to cause, ongoing harm to Quectel. Quectel has no adequate alternative to review under the APA.

**COUNT IV: The Re-Designation of Quectel as a CMC and Failure to Correct the Erroneous Original Designation Were *Ultra Vires*, in Excess of the Agency's Statutory Authority**
**(Against All Defendants)**

172. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

173. Section 1260H sets forth a specified and exclusive procedure for the Department of Defense to exercise its statutory authority to designate an entity as a CMC. As explained above, Defendants' designation of Quectel as a CMC exceeded the authority granted to the Department under the statute because Quectel does not qualify for such agency designation under the criteria set forth in Section 1260H, and the Department did not follow the statutorily mandated procedures for making and maintaining the Original Designation, and for issuing the Re-Designation. Moreover, Defendants failed to set forth an adequate basis for the Original Designation and, upon being presented the "latest information" concerning the factual basis for the Original Designation, Defendants failed to remove Quectel's Original Designation and instead sought a different factual and legal basis for Re-Designation only after Quectel initiated legal proceedings.

174. Furthermore, Section 1260H sets forth clear rules and procedures for the removal of a company's status as a CMC when the most recent information available demonstrates that it

does not meet the statutory definition. As explained above, Defendants departed from these rules and procedures in myriad ways including, but not limited to, by: (a) construing the term "affiliated with" so broadly that ordinary participation in standards-development activities and industry associations becomes sufficient to render a commercial entity a "Chinese military company;" (b) withholding a decision on Quectel's reconsideration request for an indefinite period despite a complete record, (c) failing to substantively engage with the information submitted, (d) withholding resolution of a discrete and finalized reconsideration request until a broader list of designations can be finalized and transmitted to Congress; and/or (e) preserving Quectel's designation by shifting or revising rationales only after it sought judicial review. Administering the statute in this manner exceeds the authority Congress conferred and renders the required removal procedures illusory.

175. Defendants' Original Designation and Re-Designation of Quectel as a CMC was accordingly *ultra vires* and in excess of the Department's statutory authority.

176. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties.

**COUNT V: Section 1260H Violates the Fifth Amendment as Applied to Quectel (Against All Defendants)**

177. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

178. The Fifth Amendment to the U.S. Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. At a minimum, the Due Process Clause of the Fifth Amendment requires notice and "the opportunity

to be heard" "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976).

179. Plaintiff Quectel, as a foreign entity that has established substantial connections to the United States, is entitled to the protections of the due process clause. For example, Quectel has operations in California, employs American workers, and has substantial business relationships with U.S. entities.

180. The Original Designation and Re-Designation of Quectel as a CMC deprives Quectel of its property and liberty rights, including current and future revenue from its U.S. business partners, business relationships with U.S. suppliers, the ability to effectively operate its chosen business, the ability to contract with U.S. government agencies, the ability to contract with companies that want to do business with U.S. government agencies, as well as reputational and professional goodwill.

181. Defendants violated Quectel's due process rights both in connection with the Original Designation and, independently, through the manner in which they have administered the reconsideration process as applied to Quectel. Defendants compounded these due process violations when they relisted Quectel under a new factual basis pursuant to an undefined and standardless concept of "affiliation."

182. Prior to making the Original Designation, the Department undertook a facially unreasonable investigation into Quectel's possible status as a CMC. It then failed to afford Quectel any notice or opportunity to respond to or be heard on the Original Designation despite the devastating effects an erroneous designation could have on a company like Quectel.

183. Moreover, in making the Original Designation, the Department relied on criteria that, even if it were to provide a valid basis for the Original Designation, could apply to countless

entities not designated as a CMC. In singling out Quectel, the Department has failed to rely on a clear and discernible standard that affords companies fair notice of why the Department would opt to designate one particular company and not another.

184. After the Original Designation, the Department relied on a pretextual reconsideration process in order to search for a new basis to designate Quectel—rather than to actually *reconsider* the current basis for the Original Designation. In doing so, the Department required Quectel to undertake substantial time and expense to respond to its requests—as Quectel continued to suffer under the Original Designation—while the Department had no intention of reversing course. The Department, again, failed to make a reasonable inquiry into the latest information available related to Quectel, including information provided to it as part of the reconsideration process and failed to give Quectel a meaningful opportunity to be heard.

185. As explained above, the Department's administration of the reconsideration process with respect to Quectel separately and further violated its due process because the Department (a) withheld its decision for an indefinite period despite a complete record that plainly demonstrated the Original Designation was in error; (b) failed to substantively engage with the information submitted or with Quectel's repeated requests for information concerning the reconsideration process; (c) withheld resolution of Quectel's discrete and finalized reconsideration request until a broader list of designations could be finalized and transmitted to Congress; and (d) required Quectel to initiate litigation in order to foster any meaningful agency action. A process that functions in this manner is not a genuine administrative remedy; it encourages waste of government, party, and judicial resources and deprives affected entities of fair process.

186. Attempting to preserve Quectel's Original Designation by re-listing on a new basis while reconsideration and judicial review of the Original Designation was pending did not cure

these due process violations. To the contrary, it confirmed that reconsideration operates only as a delaying mechanism rather than as a meaningful opportunity to be heard, thereby compounding the constitutional injury.

187. The Re-Designation independently deprived Quectel of due process by designating it pursuant to an undefined and standardless concept of "affiliation" that provided no meaningful notice that participation in standards-development activities or ordinary membership in a commercial industry alliance could result in designation as a Chinese military company. Again, as with the Original Designation, the Department relied on criteria that, even if it were to provide a valid basis for the Re-Designation, could apply to countless entities not designated as a CMC. In singling out Quectel, the Department has failed to rely on a clear and discernible standard that affords companies fair notice of why the Department would opt to designate one particular company and not another. The absence of a meaningful standard is particularly concerning in light of reports that the timing and administration of Section 1260H designation decisions have been influenced by political considerations unrelated to the statutory criteria for designation.[27]

188. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties.

**COUNT VI: Section 1260H is Void for Vagueness**
**(Against All Defendants)**

189. Quectel realleges and incorporates by reference the allegations contained in the preceding paragraphs.

190. As described above, Quectel is entitled to the protections of the due process clause.

---

[27] *See supra* note 27.

191. The Due Process Clause requires that persons or entities must be given fair notice of conduct that is forbidden or required. If it does not, the statute is void for vagueness. Among other things, this doctrine ensures that those enforcing the law do not act in an arbitrary or discriminatory way. *See United States v. Lesh*, 107 F.4th 1239, 1249-50 (10th Cir. 2024). Section 1260H is unconstitutionally vague as applied to Quectel.

192. Section 1260H provides no meaningful standard for determining what it means for an entity to be "affiliated with" MIIT. As the Supreme Court has explained, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). Here, the statute's undefined terms permitted Defendants to apply shifting, standardless criteria to Quectel—treating participation in standards-development activities and membership in an industry alliance as sufficient to establish affiliation as sufficient bases for designation, even though none of this conduct could have alerted Quectel that it risked being labeled a Chinese military company. The statute likewise fails to clarify whether affiliation with an entity subordinate to MIIT is equivalent to affiliation with MIIT itself.

193. As applied to Quectel, Section 1260H therefore failed to provide fair notice of what conduct could result in designation and invited arbitrary, inconsistent, and discriminatory enforcement. The statute's vague terms enabled Defendants to treat Quectel differently than similarly situated commercial entities without any principled basis.

194. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Quectel and third parties.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1. Declare the Re-Designation arbitrary and capricious, *ultra vires*, and otherwise unlawful and set it aside;

2. Remand this matter to the Department of Defense with instructions to remove Quectel's Re-Designation;

3. Declare that Defendants' failure to remove Quectel from the CMC List is action unlawfully withheld and/or unreasonably delayed;

4. Declare that Defendants violated Quectel's rights under the Due Process Clause of the Fifth Amendment of the U.S. Constitution;

5. Enjoin Defendants from taking any actions to enforce Section 1260H, including from continuing to identify Quectel as a CMC;

6. Issue an order vacating and setting aside the Re-Designation, permanently enjoining Defendants from implementing or enforcing that Re-Designation, and preserving the status quo;

7. Award Quectel its costs and reasonable attorney fees; and

8. Grant any further relief that this Court may deem just and proper.

DATED: August 5, 2026

*/s/ Wendy Wysong*
Wendy Wysong (#406103)
Brian J. Fleming (#974889)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-8158
wwysong@steptoe.com
bfleming@steptoe.com

Michael G. Scavelli
(*pro hac vice* forthcoming)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
mscavelli@steptoe.com

**CERTIFICATE OF SERVICE**

I, Wendy Wysong, hereby certify that on August 5, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which automatically serves this document upon all counsel of record, in keeping with Local Civil Rule 5.4(b).

*/s/ Wendy Wysong*
Wendy Wysong